Mark **MILLER** and Cheryl Miller, Individually and Mark Miller As Administrator of the Estate of Matthew Miller, Deceased, Plaintiffs,

v.

**PFIZER, INC. (Roerig Division), Defendant.**

CIVIL ACTION No. 99–2326–KHV.

United States District Court, D. Kansas.

Feb. 7, 2002.

personal jurisdiction.

Ruth M. Benien, Benien Law Offices, Chtd., Kansas City, KS, Richard W. Ewing, Paul F. Waldner, Vickery & Waldner, Houston, TX, Arnold Anderson Vickery, P.C., Houston, TX, for Plaintiffs.

Patrick Lysaught, Baker, Sterchi, Cowden & Rice, L.L.C., Kansas City, MO,

Robert J. E. Edwards, Polsinelli, Shalton & Welte, P.C., Kansas City, MO, James E. Hooper, Malcolm E. Wheeler, Amy L. Padden, Michael L. O'Donnell, Craig R. May, Wheeler, Trigg & Kennedy, P.C., Denver, CO, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Mark and Cheryl Miller claim that their 13 year old son, Matthew, committed suicide because he took Zoloft, a prescription drug which Pfizer Inc. manufactured for the treatment of depression. See Amended Complaint (Doc. # 92) filed December 16, 1999. In that regard, plaintiffs seek to hold Pfizer liable for failure to warn and marketing misrepresentations under common law negligence theory and the Kansas Products Liability Act, K.S.A. § 60–3304. See Pretrial Order (Doc. # 171) filed March 6, 2000. This matter comes before the Court on various motions regarding plaintiffs' primary expert witness, Dr. David Healy: Defendant Pfizer Inc's Refiled Motions To Exclude The Testimony Of Dr. David Healy And For Sanctions Against Dr. David Healy For Violations Of The Court's Protective Order (Doc. # 534) filed November 1, 2001; Plaintiffs' Post-Hearing Memorandum, And Request For Independent Expert Verification (Doc. # 545) filed November 27, 2001; Defendant Pfizer Inc.'s Opposition To Plaintiffs' Post-Hearing Memorandum And Request For Independent Expert Verification; Request For Sanctions (Doc. # 547) filed November 29, 2001; and Defendant Pfizer Inc's Motion In Limine No. 9 To Exclude The Use At Trial Of The Hindmarch Study, Dr. Healy's "Healthy Volunteer Study," And Dr. Healy's Statistical Analysis Of The Pfizer Meta–Analysis (Doc. # 304B) filed April 28, 2000. After carefully considering the parties' arguments and briefs in support, the Court is ready to rule.

## Background[1]

Sertraline hydrochloride is a selective serotonin reuptake inhibitor ("SSRI") drug which is generically known as sertraline. Pfizer markets it as Zoloft. Dr. David Healy, a Welsh psychiatrist and academic neuropsychopharmacologist, proposes to testify that Zoloft can cause depressed patients to commit suicide and that it did so in the case of Matthew Miller. In his declaration of May 9, 2000, Dr. Healy states that his opinion is based upon "research that went into ... aforementioned publications, review of depositions and testimony in the Fentress v. Eli Lilly case, depositions and trial testimony in the Forsyth v. Eli Lilly case, exhibits in both cases, depositions in the Miller v. Pfizer case, thousands of pages of Pfizer documents, the "healthy volunteer" study I conducted, as well as published and unpublished clinical trial material of which I was in possession."[2] In an article titled Zoloft And Suicide: Causal Mechanisms, which is attached to his declaration of August 13, 1999, Dr. Healy cites 54 depositions, exhibits and articles on which he has also relied. Because Dr. Healy has explained the basis for his opinions in this manner, he has

---

1. Plaintiffs' response to defendant's motion to exclude includes a section titled "Statement of Facts." Defendant does not respond to these purported facts, most of which are actually legal argument disguised as factual statement. The Court need not deem these facts admitted, however, because a response to such facts is only required for a summary judgment motion. See D. Kan. Rule 56.1.

2. Healy Declaration of May 9, 2000 (Exhibit 2) in Index Of Plaintiffs' Consolidated Exhibits To Pretrial Motions, Vol. II ("Plaintiffs' Pretrial Ex., Vol. II") (Doc. # 369) filed May 12, 2000 at ¶ 8. Although Dr. Healy notes in his declaration of May 9, 2000 that he has utilized material from another lawsuit, he does not specify the particular material on which he has relied.

opened an almost limitless arena of material for the Court to review in evaluating the admissibility of his testimony. Of course this is precisely the situation which the mandatory disclosure requirements of Fed. R.Civ.P. 26(a)(2) seek to avoid. See *Burton v. R.J. Reynolds Tobacco Co.*, 203 F.R.D. 636, 639 (D.Kan.2001). Nonetheless the Court has carefully reviewed every article in the record which Dr. Healy has cited in his various declarations. Aside from Dr. Healy's own articles, none of them directly support his claim that Zoloft causes akathisia, which in turn causes suicide in depressed patients. For the purposes of the pending motions, the Court focuses on the articles and research that Dr. Healy has authored or on which he appears to place particular emphasis: his own "Healthy Volunteer Study," his statistical analysis of pre-existing Pfizer data (the so-called Pfizer "Meta–Analysis"), his application of Koch's Postulates, and his evaluation of three studies—one by Dr. Ian Hindmarch (the so-called "Hindmarch Study") and two challenge-dechallenge-rechallenge studies by other authorities.

Dr. Healy is an accomplished researcher in the area of neuropsychopharmacology, and his credentials are not in dispute. Indeed, he is an eminent psychiatrist and neuropsychopharmacologist who has made important contributions to the history of psychiatry and many significant clinical contributions.[3] Notwithstanding his credentials, Pfizer asks the Court to exclude Dr. Healy's opinions, along with certain studies and calculations on which he relies—the Hindmarch Study, the Healthy Volunteer Study, and the Pfizer Meta–Analysis. Pfizer does not seek to exclude the two challenge-dechallenge-rechallenge studies, although it does discount them as "case reports" and "anecdotal evidence."

To assist the Court in evaluating Dr. Healy's opinions under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Court appointed two independent experts: John Concato, M.D., M.S., M.P.H. and John M. Davis, M.D.[4] Dr. Concato, a professor at the Yale University School of Medicine, is a general internist and clinical epidemiologist who is a preeminent authority in his field.[5] Dr. Davis is a professor in the department of psychiatry at the University of Illinois at Chicago; he has practiced in the field of neuropsychopharmacology since 1965, spending seven years with the National Institute of Mental Health. He was one of the first scientists to study affective disorders and the theory that reserpine can lead to suicide.[6] Dr. Davis was a member of the FDA's Psychopharmacological Drug Advisory Committee ("PDAC") which examined the initial drug application for Zoloft,[7] and concluded that it was safe and effective for the treatment of depression.[8]

On September 5, 2001, after reviewing materials which the parties jointly submitted, the experts submitted their Report Of Independent Experts (Doc. # 502) ("Independent Expert Report"). On November

---

**3.** Transcript Of November 19, 2001 Hearing ("Transcript") (Doc. # 550) filed November 30, 2001 at 8.

**4.** See Order Appointing Independent Experts (Doc. # 486) filed April 24, 2001. Dr. Davis and Dr. Concato rendered invaluable service in this case and the Court is extremely grateful for their assistance.

**5.** Transcript (Doc. # 550) at 93–94.

**6.** *Id.* at 4–6.

**7.** *Id.* at 72.

**8.** See PDAC Transcript (Exhibit FF) in Appendix To Defendant's Partial Summary Judgment On Plaintiffs' Failure To Warn Claim, Vol 3 ("Pfizer's Failure To Warn Appendix, Vol. 3") (Doc. # 226) filed April 18, 2000 at 117.

19 and 20, 2001, the Court held a Daubert hearing at which the parties had an opportunity to question the experts and present other relevant evidence.

## Legal Standard

Rule 702, Fed.R.Evid., provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the princi-

ples and methods reliably to the facts of the case." [9]

## Analysis

**I. Defendant's Motions To Exclude Dr. Healy's Testimony (Doc. # 534) And Use At Trial Of The Hindmarch Study, The Healthy Volunteer Study And The Pfizer Meta–Analysis (Doc. # 304b)**

■ Dr. Healy proposes to testify about (1) general causation (that Zoloft causes suicide); (2) specific causation (that Zoloft caused Matthew Miller to commit suicide); (3) suicidology and the incidence of teen suicide; (4) the adequacy of Pfizer's warnings about Zoloft; and (5) the regulation of pharmaceuticals by the FDA.[10]

9. This statement of the rule incorporates the amendment effective December 1, 2000. The Court uses its discretion under 28 U.S.C. § 2074(a) to apply the amended rule since the new language codifies the existing standards for Rule 702 and does not represent a substantive change in the law.

10. Dr. Healy's opinion, as it has evolved throughout this litigation, can be found in his Rule 26 Statement of August 13, 1999 ("First Rule 26 Statement"), contained as Exhibit 91 in the Appendix Of Exhibits (Nos. 86–99) To Defendant Pfizer Inc's Pretrial Motions ("Pfizer's Pretrial Ex. Nos. 86–99") (Doc. # 232) filed April 18, 2000, including a document by Dr. Healy titled Zoloft And Suicide: Causal Mechanisms, which is part of Dr. Healy's First Rule 26 Statement; his Rule 26 Statement of December 10,1999 ("Second Rule 26 Statement"), contained as Exhibit 48 in Appendix Of Exhibits (Nos. 26–51) To Defendant Pfizer Inc's Pretrial Motions ("Pfizer's Pretrial Ex. Nos. 26–51") (Doc. # 229) filed April 18, 2000; the Declaration Of David Healy, M.D. dated May 9, 2000, contained as Exhibit 2 in Index Of Plaintiffs' Consolidated Exhibits To Pretrial Motions, Vol. I ("Plaintiffs' Pretrial Ex., Vol. I") (Doc. # 368); his Letter Report of March 6, 2000 attached as Exhibit G in Memorandum Of Law In Support Of Defendant Pfizer's Motion In Limine No. 9 To Exclude The Use At Trial Of The Hindmarch Study, Dr. Healy's "Healthy Volunteer Study," And Dr. Healy's Statistical Analysis Of The Pfizer Meta–Analysis ("Pfiz-

er's MIL No.9 Memorandum") (Doc. # 304C) filed April 28, 2000; and his deposition on March 27 and 28, 2000, Deposition Of David T. Healy, M.D., attached as Exhibit C to Pfizer's MIL No. 9 Memorandum (Doc. # 304C). In his First and Second Rule 26 Statements, Dr. Healy expresses his belief that through the mechanisms of akathisia and emotional indifference, Zoloft in general can "make an individual who may not have been likely to commit suicide before taking the pill, more likely to do so while on a course of treatment." In support of this opinion, Dr. Healy cites (1) case reports in the literature (of which he was the senior author on one); (2) two extensive reviews of the topic of antidepressant-induced suicidality which he authored in 1994 and 1999; (3) his doctoral thesis; (4) an epidemiological study (in which he was involved) to calculate rates of suicide in primary care mood disorders; (5) interviews with senior figures in the field of psychopharmacology, gathered as a history of antidepressants; and (6) his Healthy Volunteer Study.
Dr. Healy's article titled Zoloft And Suicide: Causal Mechanisms, which is part of his First and Second Rule 26 Statements, is a rambling and largely disjointed discourse which basically purports to overthrow randomized controlled trials [RCTs] and epidemiological studies as the "gold standard" for demonstrating cause and adverse effect relationships between sertraline and suicide, and enthrone Koch's Postulates in their place. Dr. Healy's politics on this issue are evident as he claims

## A. General Causation

Dr. Healy's view as to general causation is a distinctly minority view. The American College of Neuropsychopharmacology, the FDA's PDAC, and the Medicines Control Agency in his own United Kingdom have all reached contrary conclusions.[11] For this reason and others, Pfizer argues that Dr. Healy's opinions and methodologies are unreliable and inadmissible under Daubert and Federal Rules of Evidence 106, 403, 702 and 703.[12]

In concluding that Zoloft causes suicide in some patients, Dr. Healy relies heavily upon case reports and his own studies and calculations, and disavows the need for randomized controlled trials ("RCTs") and epidemiological studies.[13] His opinion rests most heavily on his own Healthy Volunteer Study, his Meta–Analysis of Pfizer data (which allegedly yields a relative risk calculation of 2.19), his application of Koch's Postulates, and his evaluation of three studies—the Hindmarch Study and two challenge-dechallenge-rechallenge studies.[14] Because these studies are criti-

---

that "[a]s regards RCTs and causality, the single greatest role RCTs and epidemiological studies are likely to play in cases of SSRI induced suicidality are to stand as an expensive assessment technologies [sic] that only pharmaceutical corporations have the ability to employ," and that "[t]he portrayal of these methods as gold standards owes everything to a strategy which involves occupying the playing field rather than one which in actual fact delivers what is claimed for it."

In his declaration of May 9, 2000, Dr. Healy attempts to answer criticisms which Pfizer has lodged against his various opinions and methodologies. Primary topics of discussion include (1) the structure and results of his Healthy Volunteer Study; and (2) his claim to have conducted a Meta–Analysis of Pfizer data, yielding a relative risk calculation of 2.19 for Zoloft versus placebo and an increased relative risk of 2.05 in studies conducted specifically on children. The balance of Dr. Healy's declaration is more argument and invective than scientific in nature.

In his letter report of March 6, 2000, Dr. Healy states that his review of "the Pfizer suicide collection of documents" very strongly supports his prior opinions. In particular, he cites evidence that healthy volunteers became so agitated on Zoloft that they had to discontinue its use; that Pfizer had internally used a challenge-dechallenge paradigm when assessing causality; and that in Pfizer's own assessment Zoloft has induced suicidality in young children.

11. Independent Expert Report (Doc. # 502) at 2.

12. In part, Pfizer complains that Dr. Healy's opinions were developed in the course of anti-Zoloft litigation. In *Daubert v. Merrell Dow*

*Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), the Ninth Circuit placed considerable emphasis on this factor in addition to those which the Supreme Court enumerated in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The additional factor is not particularly useful, however, in this case. One would not expect Dr. Healy to opine before this lawsuit that Zoloft caused Matthew Miller to commit suicide. On the other hand, Dr. Healy has been alleging for years that drugs like Zoloft generally cause suicide. See, e.g., *David Healy and William Creaney, Fluoxetine And Suicide*, 303 Brit. Med. J. 6809, 1058–59 (Oct. 26, 1991) (editorial letter); David Healy, The Fluoxetine And Suicide Controversy, 1 CSN Drugs 223–231 (1994).

13. See August 13, 2000 Healy Declaration (Exhibit 91) in Pfizer's Pretrial Ex. Nos. 86–99 (Doc. # 232) at 0000083.

14. Dr. Healy also relies on conversations with Dr. Paul Leber (former head of the Central Nervous System division of the FDA), which is responsible for licensing Zoloft, and the deposition of Dr. Douglas Geenens (Matthew Miller's treating physician), and a plethora of articles in the medical literature—all of which speak for themselves. Because these materials do not confirm Dr. Healy's hypothesis that Zoloft causes akathisia, which in turn causes suicide in depressed patients, these materials do not directly factor into the Daubert analysis. For purposes of this order the Court generally ignores them and focuses on the original work by Dr. Healy which—when read against the backdrop of his conversations and review of depositions and medical literature—

cal to an understanding of his testimony, they are briefly summarized as follows:

**Healthy Volunteer Study:** In 1999, Dr. Healy conducted a double-blind study of 21 healthy volunteer health care workers from the North Wales Department of Psychological Medicine in Bangor, Wales, of which Dr. Healy is the director.[15] Dr. Healy and his research assistant recruited the subjects from administrative, medical and nursing staff who ranged in age from 28 to 52 years. According to Dr. Healy, none were on concurrent drug treatment, all were free of medical conditions and none had a history of psychiatric illness. Under the study, each volunteer took either sertraline (Zoloft) or reboxetine[16] for 15 days. After this period, the volunteers were drug-free for two weeks. For the next 15 days, each volunteer switched and used the other drug. None of the subjects had suicidal ideation while taking reboxetine. During the second regimen, two volunteers who were taking Zoloft developed "clear suicidal ideation" (one of which reached "extremely serious proportions"), along with elements of akathisia and emotional blunting. Akathisia is "[a] syndrome characterized by an inability to remain in a sitting position, with motor restlessness and a feeling of muscular quivering."[17] Other subjects had these features but did not become suicidal. The study did not use a placebo control. Because of the nature of the study, it involved extensive interaction between research personnel and participants during the study and afterwards in focus groups; furthermore, the volunteers were "more or less aware" of Dr. Healy's views and the fact that he expected them to react more poorly on Zoloft than on reboxetine.

**Meta–Analysis of Pfizer Data:** On April 15, 2000—after Dr. Healy's deposition and four iterations of expert reports in this case—plaintiffs filed their second supplemental responses to Pfizer's first requests for admissions.[18] At that time they first disclosed that Dr. Healy had completed a "meta-analysis" of Pfizer data and that his review indicated a "relative risk of suicidal acts on Zoloft, compared to placebo and corrected for exposure times of 2.19 (i.e. 2.31 vs. 1.0555)." According to plaintiffs, Dr. Healy's analysis was as follows:

All Zoloft treated MDD cases–23 suicidal acts in 6,549 subjects = 2.31% per year; All TCA treated–2 suicidal acts in 922 subjects = 1.37% per year; All placebo treated–3 suicidal acts in 1,042 subjects = 1.055% per year.

---

purports to directly connect Zoloft and suicide through the medium of akathisia.

**15.** Dr. Healy first referred to this study on December 10, 1999, in his Second Rule 26 Statement, when he noted that data from this study was still being analyzed and should be available for peer review and inspection in February of 2000. On February 1, Dr. Healy produced limited materials, consisting of a draft article entitled Emergence of Antidepressant Induced Suicidality and daily reports from two volunteers who had taken part in the study. At the time of his deposition on March 27 and 28, 2000, Dr. Healy had not completed his analysis and he did not claim that the results of his study were statistically significant.

The study was designed for 20 volunteers, one of whom dropped out after one week on reboxetine and was then replaced with another subject.

**16.** Reboxetine is a norepinephrine reuptake inhibitor which is used to treat depression. See Attorney's Medical Deskbook (3rd ed.2000). The FDA has not approved reboxetine for sale in the United States.

**17.** Stedman's Medical Dictionary (26th ed.1995) at 41.

**18.** See Plaintiffs' Second Supplemental Responses, Per Order Of The Court To Defendant Pfizer Inc's First Requests For Admissions (Exhibit N) to Pfizer's MIL No.9 Memorandum (Doc. # 304C).

The Court cannot locate in the record a more precise explanation of Dr. Healy's calculation. It may derive from premarketing clinical trials for Zoloft which set forth data and incidence rates for suicides and suicide attempts in Zoloft-treated, placebo-treated and active-control-treated depressed patients. It may derive from reports which Pfizer provided the FDA in connection with its application to market Zoloft for the treatment of pediatric patients with obsessive compulsive disorder. Neither the Pfizer experts nor the independent experts have been able to replicate the calculation.

**Koch's Postulates:** Koch's Postulates are a series of factors which are designed to assist in determining general causation and whether a drug may cause a certain reaction. The factors are strength of association, consistency with other research, alternative explanations, temporal relationship, biological plausibility, specificity of association and dose-response relationship. Reference Manual On Scientific Evidence ("Reference Manual") (1st ed.1994).[19] In his analysis of Koch's Postulates, Dr. Healy did not attempt to directly assess whether Zoloft causes suicidal ideation or behavior. Instead he focused on whether SSRI drugs have a favorable therapeutic effect on depressive disorders (Dr. Healy concluded that the strength of this association is "in fact ... rather weak") and the link between SSRI drugs and akathisia (Dr. Healy concluded that this association was much stronger, if not conclusive). He therefore concluded that "there is greater specificity in the relationship between SSRI and akathisia than there is between

the SSRI and the response of a depressive disorder."

With regard to the association between SSRI drugs and akathisia, based on his application of Koch's Postulates, Dr. Healy concluded that (1) as to strength of association, akathisia is a clear-cut event which is strongly associated with some insult to the central nervous system such as an infective process or drug intake and, in the case of Zoloft, akathisia may occur in at least a mild form in over 50 per cent of the patients who are taking the drug; (2) as to temporal relationship, akathisia has a fairly predictable temporal onset in relation to the intake of Zoloft, i.e. 24 to 48 hours following the institution of treatment or an escalation of dose (a phenomenon which builds to a peak over one to two weeks as the drug dosage rises in the body); (3) as to biological plausibility, there appears to be a "clear biological mechanism" by which SSRI drugs produce akathisia;[20] (4) as to specificity of association, not all antidepressants appear capable of producing akathisia and "there is ... greater specificity in the relationship between an SSRI and akathisia than there is between the SSRI and the response of a depressive disorder;" and (5) as to dose-response relationship, there appears to be a clear dose-response relationship between SSRI intake and akathisic phenomena. Dr. Healy did not address two postulates: consistency with other research and alternative explanations. On the other hand, he added four factors: salience of association, consistency of association, support by experiment and support by analogy. As to salience of association (which he explained as "the

19. The second edition of the Reference Manual was issued during the pendency of this litigation. Earlier orders refer to the first edition but the Court will also refer to the second edition where applicable. This order will distinguish the two by including the edition and year in its citations.

20. Dr. Healy does not identify this "clear biological mechanism," other than to state that it can be "blocked or ameliorated" through drugs.

difficulty in otherwise explaining the effect"), Dr. Healy stated that the association between SSRI drugs and akathisia may be "very salient," in that the patient may be visibly distressed and clearly deteriorated "with no ... means of explaining what is happening other than by invoking an action of a drug." As to consistency of association, Dr. Healy stated that akathisia has a physiological input which appears to occur across all personality types, and akathisia in response to a particular agent strongly predicts renewed akathisia on further exposure to the triggering agent. As to support by experiment, Dr. Healy stated that in his own tests, healthy volunteers who took droperidol all became akathisic and up to five became suicidal, with two becoming acutely suicidal within hours of treatment. Although Dr. Healy does not explain what droperidol is, or how it relates to this litigation, he posits that this experiment constitutes "strong evidence" in favor of the proposed mechanism of action whereby an SSRI may produce suicidality. Finally, as to support by analogy, Dr. Healy states that according to case reports, patients committed suicide on Prozac (another SSRI drug) and reserpine (a drug which is active on the serotonin system and according to Dr. Healy "probably" causes akathisia by similar mechanisms to Zoloft) even though they were "not depressed at all" and had "no nervous condition on which the suicide could be blamed." According to Dr. Healy, these case studies provide "strong evidence" of a causal relationship between SSRI intake and suicidality.

**Hindmarch Study:** In 1988, Dr. Ian Hindmarch conducted a double-blind placebo-controlled crossover study to assess the effects of sertraline (Zoloft), alone and with diazepam (Valium), on the psychomotor performance of 12 healthy volunteers at the University of Leeds, U.K.[21] On April 14, 2000, after Dr. Healy's deposition and various expert reports, plaintiffs served supplemental discovery responses. In plaintiffs' second supplemental responses to Pfizer's first requests for admissions,[22] they stated that according to Dr. Healy, the Hindmarch study demonstrated a relative risk greater than two for "emotional blunting" and probable aggressive, assaultive or suicidal behavior in persons taking Zoloft. These claims are not explained in the record, which reveals that (1) the Hindmarch study dose began at 150 mg (three times more than the recommended 50 mg starting dose for Zoloft and three times more than the dose allegedly taken by Matthew Miller); (2) none of the volunteers had any diagnosed psychiatric condition; and (3) it appears that none of the study volunteers reported assaultive behavior, depression, akathisia, or homicidal or suicidal behavior, ideation or attempts.

**Challenge–Dechallenge–Rechallenge Articles:** In concluding that Zoloft causes suicide, Dr. Healy relied upon two challenge-dechallenge-rechallenge studies. The first was a 1991 report by Anthony J. Rothschild, M.D. and Carol A. Locke, M.D., which discussed three patients (all of whom had histories of suicidal ideation) who made serious suicide attempts during treatment with fluoxetine (Prozac).[23]

---

**21.** This study is aptly titled, A Double–Blind Placebo–Controlled Cross–Over Study To Assess The Effects Of Sertraline, Alone And With Diazepam, On Psychomotor Performance. Exhibit P in Pfizer's MIL No.9 Memorandum (Doc. # 304C).

**22.** See Plaintiffs' Second Supplemental Responses, Per Order Of The Court To Defen-

dant Pfizer Inc's First Requests For Admissions (Exhibit N) to Pfizer's MIL No.9 Memorandum (Doc. # 304C).

**23.** Re-exposure To Fluoxetine After Serious Suicide Attempts By Three Patients: The Role Of Akathisia, 52 J. Clin. Psychiatry 491–93 (1991).

During re-treatment with fluoxetine, all three developed severe akathisia—stating that the akathisia made them feel suicidal and, in the context of their depressive episodes, had precipitated their prior suicide attempts. The akathisia and suicidal ideation abated after fluoxetine was discontinued or propranolol (an anti-akathisia medication) was added. The authors noted that they had observed the emergence of suicidal ideation secondary to akathisia in only three of 1,500 patients (0.2%)—perhaps in part because they had lowered the fluoxetine dose when side effects developed and promptly recognized and treated the akathisia. They noted the hypothesis that suicidal ideation and suicide occur secondary to the emotional distress of akathisia, but also cautioned that "[i]t remains unclear whether there exists a common pharmacologic basis for akathisia and suicidal ideation or acts." Because it is "conceivable that the development of akathisia in patients with a past history of suicidal or homicidal ideation is particularly problematic," the authors added that "clinicians should remain alert to the development of akathisia in patients taking fluoxetine and to the fact that patients are often unable to distinguish akathisia from the ongoing symptoms of their psychiatric illness," i.e. patients need to be reassured that the symptoms are side effects of medication and are treatable.

 The second challenge-dechallenge-rechallenge study involved six case reports in an article by Dr. Robert King, et al.[24] In these reports, self-injurious ideation or behavior appeared or intensified during fluoxetine treatment of six patients, age 10 to 17 years, who were among 42 young patients receiving fluoxetine for obsessive compulsive disorder ("OCD"). Before they received treatment, four of the six patients had major risk factors for self-destructive behavior, including depression or prior suicidal ideation or self injury. The article examined three possible explanations for the emergence of suicidal ideation and self-destructive behavior in the six subjects: (1) that it was coincidental, in that while all six subjects had received fluoxetine, they all had complex long-standing psychiatric difficulties; (2) that it was a consequence of the treatment or was related to medication-induced agitation, disorganization or mood changes; and (3) that it was due to a specific effect of fluoxetine on the regulation of aggression directed either outward or toward the self. The authors concluded that while the adverse side effects appeared to be more than coincidental as to four of the six patients, "[d]istinguishing among these three alternatives [was] not possible on the basis of the uncontrolled clinical material presented here." Accordingly, they suggested a need for more research. Pfizer first argues that Dr. Healy's testimony on general causation will not satisfy the pertinent indicia of scientific reliability or assist the trier of fact in this case. Under Daubert, a district court must determine at the outset, pursuant to Rule 104(a), whether expert testimony is reliable and will assist the trier of fact to understand or determine a fact in issue. See *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. In determining whether a particular scientific theory or technique is reliable, the district court may consider several nondispositive factors: (1) whether the proffered technique can and has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a technique in the relevant scientific community. *Id.* at 593–94, 113 S.Ct.

---

24. Emergence of Self–Destructive Phenomena in Children and Adolescents during Fluoxetine Treatment, 30 J. Am. Acad. Child Adolesc. Psychiatry 2, 179–186 (March 1991), attached as Exhibit 12 to Plaintiffs' Pretrial Ex., Vol. I (Doc. # 368).

2786. The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." *Mitchell v. Gencorp. Inc.*, 165 F.3d 778, 780 (10th Cir.1999). An expert's qualifications are relevant to the reliability inquiry. See *United States v. Taylor*, 154 F.3d 675, 683 (7th Cir.1998); *In re Indep. Serv. Org. Antitrust Litig.*, 85 F.Supp.2d 1130, 1163 (D.Kan.2000).

## 1. Methodology

The first Daubert factor asks whether a theory is susceptible to testing and whether the theory has been subjected to such testing. See *Mitchell*, 165 F.3d at 780 (citing *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786). Pfizer appears to concede that Dr. Healy's theory can be tested, but argues that it has not been tested because Dr. Healy has not conducted and does not rely on any RCT or large-scale epidemiological study which demonstrates a causal relationship between Zoloft and suicide in depressed patients. Absent such studies, Pfizer faults Dr. Healy for relying on tests which involve SSRI drugs *other* than Zoloft and drugs which are not even SSRI drugs *like* Zoloft, or which involve other patient populations or other adverse side effects or events.[25]

Plaintiffs admit that Dr. Healy does not rely on the type of RCTs or large-scale epidemiological studies which Pfizer insists are requisite to an expert opinion as to causation, but they argue that his hypothesis has been otherwise tested in two challenge-dechallenge-rechallenge studies, his own Healthy Volunteer Study and Meta–Analysis of Pfizer data, as well as by Koch's Postulates.[26]

■ Plaintiffs are correct that RCTs and large-scale epidemiological studies are not essential to the formation of an expert opinion as to causation. See *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir.2001) (expert not required to rely on epidemiological studies; testimony allowed when district court found expert reliance on temporal connection, animal studies, studies of chemicals with similar structures, study of drug at issue and the manner of acting on nerve pathways, and plaintiff's medical records showed reliable methodology under Daubert); *Brasher v. Sandoz Pharm. Corp.*, 160 F.Supp.2d 1291, 1296–98 (N.D.Ala.2001) (expert testimony allowed despite lack of large-scale epidemiological study when experts relied on animal studies, case reports, Adverse Drug Reaction reports to FDA, generally accepted notion in the medical community and ruled out all other possible causes;

25. For purposes of this analysis, Pfizer cites no evidence which suggests a relevant difference between Zoloft and other SSRI drugs. Indeed in some instances Pfizer insists that because Zoloft is similar to other SSRI drugs, it—like the other SSRI drugs—does not cause suicide. Compare Memorandum In Support Of Defendant Pfizer Inc.'s Motion To Exclude Testimony Of David Healy ("Defendant's Exclusion Memorandum") (Doc. # 535) filed November 1, 2001 at 21 (chastising Dr. Healy for references to other SSRIs) and Defendant's Exclusion Memorandum (Doc. # 535) at 24–26 (reliance on studies of Prozac, another SSRI drug, for proposition that link to suicide has been refuted). Obviously Pfizer cannot have it both ways. The Court will

consider evidence regarding other SSRI drugs, although such evidence may not be as weighty as that which directly concerns Zoloft.

The Court does disregard studies which concern non-SSRI drugs. On this record, studies of these drugs would appear to have limited utility since they are not shown to be comparable in operation or effect.

26. None of the parties discuss Koch's Postulates in the context of testing, and the Court proceeds on the assumption that because Koch's Postulates are basically a manner of reasoning, they cannot be "tested" in a logical or empirical sense.

large-scale study nearly impossible because adverse reaction was rare event and study would unethically expose patients to risk of harm); *Ruff v. Ensign–Bickford Indus., Inc.,* 168 F.Supp.2d 1271, (D.Utah 2001) (lack of epidemiological data no bar to expert testimony that relied on numerous animals, discredited the one study relied upon by defendants and ruled out alternative causes).

At least as to Koch's Postulates, the independent experts do not disagree that Dr. Healy has identified a method of testing the potential cause-effect relationship of sertaline and suicide.[27] For purposes of this order the Court assumes that challenge-dechallenge-rechallenge studies, double-blind studies like Dr. Healy's Healthy Volunteer Study, and meta-analysis of data from randomized controlled trials or large-scale epidemiological studies are all legitimate tests which may be applied to determine whether Zoloft induces suicidal ideation or behavior. The Court therefore finds that Dr. Healy's hypothesis is amenable to testing and that he has at least identified tests which have some bearing on the issue of general causation. While Pfizer argues that his methodology is fatally flawed, that argument is addressed by Daubert's fourth factor, which the Court discusses below.

## 2. Peer Review And Publication

The second Daubert factor asks whether the expert's theory or technique has been submitted to peer review and publication. Pfizer argues that Dr. Healy has not published any peer-reviewed article which states that Zoloft causes some people to commit suicide, and that his Meta–Analysis (including his relative risk calculation of

2.19) has not been subject to peer review. According to the independent experts, Dr. Healy is an accomplished investigator who has published several articles which are directly relevant to the issue of a possible association between sertraline and suicide, including Suicide In The Course Of The Treatment of Depression, 13 J. of Psychopharmacology 4–99 (1999), and Emergence Of Antidepressant Induced Suicidality, 6 Primary Care Psychiatry 23–28 (2000) (concerning Dr. Healy's Healthy Volunteer Study).[28] The experts characterize the first article as a "review" or "thought-piece" on possible mechanisms that would explain why patients commit suicide while taking antidepressants and the second article as "a randomized, controlled trial of two agents, given to 20 patients (total), that also included a component of qualitative analysis regarding changes in emotional state."[29] Although neither article proposed new or modified methods to determine causality and the editors and reviewers did not endorse Dr. Healy's methodology, both pieces were peer-reviewed and deemed suitable for publication.[30] Both articles theorize that SSRI drugs in general, and sertraline in particular, causes suicide in some patients. Pfizer is therefore incorrect in its argument that Dr. Healy has not published any peer-reviewed article which claims that Zoloft causes some people to commit suicide.

On the other hand, Dr. Healy has not subjected to peer review his calculation, based on his Meta–Analysis of Pfizer data, that Zoloft carries a relative risk of suicide of 2.19.[31] Thus, while the theory behind Dr. Healy's work has been subject to limited peer review and publication, his relative risk calculation has not.[32]

27. Independent Expert Report (Doc. # 502) at 1.

28. *Id.*

29. *Id.* at 1–2.

30. *Id.* at 2.

31. *Id.* at 1.

32. At the Daubert hearing, plaintiffs argued that Dr. Healy cannot subject his relative risk

### 3. Rate Of Error And Proper Controls

Pfizer argues that Dr. Healy's Healthy Volunteer Study cannot properly form a basis for his opinions on causation because (1) it was not a placebo-controlled test; (2) it did not result in a single suicide attempt; (3) its methodology has not been explained; (4) the sample size is too small to yield statistically significant analysis; (5) the cross-over design could lead to erroneous results; and (6) the volunteers were medical employees in the hospital department that Dr. Healy directed. To some degree, many of these problems result from the fact that the Healthy Volunteer Study was not designed to research suicide but to test the effects of sertraline and reboxetine on the well-being of healthy subjects.

According to the independent experts, the lack of a placebo control in this context is not so much scientifically improper as it is problematic in evaluating the "big picture" question of a possible association between sertraline and suicide.[33] In other words, "[w]hen results from the study are extrapolated to the issue of sertraline possibly causing suicide, ... a question can be raised what potential information is unavailable due to the absence of a placebo group ... [f]or example, ... would patients receiving placebo have reported any fluctuations in their emotional state when asked to keep a diary, etc." The experts noted that although this scenario might seem unlikely, the absence of placebo controls "may affect the interpretation of the study findings."

The independent experts also criticized the design of Dr. Healy's Healthy Volunteer Study in two important respects. First, its methodology involved intensive interaction between participants and research personnel, as well as a focus group at the end of the study—strategies which (along with a corresponding emphasis on patient narratives) represented qualitative rather than quantitative research. Second, because of the small sample size and the qualitative nature of the research, statistical analysis—while it theoretically could be done—would not produce a statistically significant result or provide a sufficient basis for calculating a statistically significant relative risk.

During the Daubert hearing, Dr. Healy admitted that his Healthy Volunteer Study was not designed to research treatment-emergent suicidality and that any conclusions regarding that phenomena were a by-product of the study results—not the design. He also acknowledged that his study was not well designed for relative risk calculations. Dr. Healy also agreed

calculation to peer review since it is based on confidential data. Transcript (Doc. # 550) at 39–40. As the Supreme Court held, however, in Daubert,

> Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability ... and in some instances well-grounded but innovative theories will not have been published. ... Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. .... The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

Daubert, 509 U.S. at 593–94, 113 S.Ct. 2786. Regardless of the reason why Dr. Healy's numbers have not been subject to publication and peer review, the lack of peer review means that the Court simply does not have the assurance of reliability that this Daubert factor would normally provide.

33. Independent Expert Report (Doc. # 502) at 16.

with the independent experts that subliminal communication between the researchers and the volunteers may have influenced the results. In particular, before the study Dr. Healy gave the subjects detailed information regarding the side effects of each drug. Subjects who had certain side effects might therefore deduce which drug they had received.[34] Dr. Healy also admitted that three subjects were on medication despite the fact that the research protocol was that the subjects would not be on medication, other than oral contraceptives.[35] In addition, even though the subjects allegedly had no histories of psychiatric illness, one of them had a history of depression.[36]

At the hearing, Pfizer took aim on the two subjects who allegedly had adverse effects on sertraline. Initial mental health examinations were not done on either volunteer.[37] Dr. Healy claimed that mental health screenings were supposed to be completed later, but did not address the fact that the researchers did not have a mental health base line for either subject. Furthermore, Dr. Healy could not rule out a carry-over effect from the reboxetine which the volunteers had taken before they started on Zoloft.[38] Dr. Healy opined that any reboxetine effect was probably small since reboxetine on its own did not cause agitation in any volunteer, but he did not address what effect reboxetine *with sertraline* may have had. Of the two volunteers who developed adverse reactions on sertraline, one lost her grandmother during the reboxetine period and during

that time was unable to sleep or eat and felt annoyed, unhappy, miserable and angry.[39] The other felt terrible (like she had a flu bug) during the reboxetine period and she could not eat or sleep. Her bad experience on sertraline was preceded by a migraine headache, which Dr. Healy opines may have been drug-induced.[40]

Dr. Healy did not defend the design of his Healthy Volunteer Study in a manner which adequately addresses the criticisms of Pfizer or the independent experts. The Court must therefore conclude that his Healthy Volunteer Study does not include controls sufficient to prove that Zoloft causes akathisia-induced suicide in depressed patients.

### 4. General Acceptance Of Methodology

Pfizer argues that the medical community does not agree that Zoloft causes suicide, and that Dr. Healy cannot testify otherwise. The "general acceptance" factor bears on the technique used, however, rather than the conclusion reached. As noted above, Dr. Healy has reached his conclusion by conducting his own so-called Healthy Volunteer Study, using the results of two challenge-dechallenge-rechallenge articles, conducting a Meta–Analysis of Pfizer's own clinical trial data and applying Koch's Postulates to his hypothesis that Zoloft causes suicide. The Court examines whether Dr. Healy's technique in each of these areas constitutes generally accepted methodology.

---

**34.** Dr. Healy defended this study design as a good way to ensure that subjects carefully monitored their mental states, but Pfizer says that this is not considered the proper way to conduct a study. See Transcript (Doc. # 551) at 333–35.

**35.** See Transcript (Doc. # 551) at 309–11.

**36.** She was not one of the two subjects who became suicidal on Zoloft. *Id.* at 313–15.

**37.** *Id.* at 317–18.

**38.** *Id.* at 319–20.

**39.** *Id.* at 322–23.

**40.** *Id.* at 328–29.

### a. Healthy Volunteer Study

Pfizer argues that Dr. Healy's Healthy Volunteer Study did not adequately test his theory that Zoloft causes suicide because he did not initially provide his methodology or use a placebo control. While Dr. Healy has now provided his methodology, the independent experts concluded that "[t]he healthy volunteer study is not a sufficient basis for calculating any statistically significant relative risk, due to issues involving study design and sample size." [41] They noted that because "the phenomenon of patients reporting symptoms while taking placebo is more the rule than the exception," the study raised a question "what potential information is unavailable due to the absence of a placebo group"— e.g., would patients receiving placebo have reported any fluctuations in their emotional state when asked to keep a diary, etc. More importantly, Dr. Concato and Dr. Davis criticized Dr. Healy's methodology because (1) it involved extensive interaction between research personnel and participants; and (2) in the circumstances, statistical calculations represented a statistical "exercise" rather than a statistically significant result. [42] Furthermore, Dr. Healy and his research assistant personally recruited the subjects from the department of which Dr. Healy is the director and each volunteer was "more or less aware" of Dr. Healy's expected outcome. From these criticisms, especially in light of the small sample size, the Court must readily conclude that Dr. Healy's Healthy Volunteer Study does not represent a generally accepted methodology for testing the hypothesis that Zoloft causes suicide.

### b. Challenge–Dechallenge–Rechallenge Reports

In concluding that Zoloft causes suicide, Dr. Healy relied upon two challenge-dechallenge-rechallenge studies which are basically case reports regarding nine individuals (of approximately 1,542) who developed suicidal ideation or behavior during treatment with fluoxetine (Prozac). According to the independent experts, heavy reliance on case reports is not an accepted methodology for determining the strength of association which Dr. Healy advocates between Zoloft and suicide. [43]

A major problem is that "suicides would be expected among patients taking sertraline, and the occurrence of such events does not establish causality." [44] It is therefore generally accepted metholodogy to "control" or "adjust" for factors (such as propensity to commit suicide) that may influence the strength of the cause-effect association. In this context, the independent experts noted that

> [d]etermining the strength of an association requires at least two groups of subjects, one exposed to the agent of interest (sertraline), the other not so exposed, so that rates of the outcome event (suicide) can be determined and compared. . . . [T]he lack of a comparison group would . . . make a series of case reports unsuitable for determining the quantitative strength of an association, regardless of other attributes. [45]

Also, as Dr. Davis noted at the Daubert hearing, a rechallenge study can consist of merely anecdotal evidence with many possible explanations—including coincidence. [46] Dr. Davis explained:

**41.** Independent Expert Report (Doc. # 502) at 17.

**42.** Independent Expert Report (Doc. # 502) at 17–18.

**43.** *Id.* at 4.

**44.** *Id.* at 4.

**45.** *Id.* at 4–5.

**46.** Transcript (Doc. # 550) at 34–35, 65.

[A]necdotal studies are important because the brilliant clinician might discover something that everybody else missed and it might be proven ten years later. . . . So I'm not putting down anecdotal information, but there's a lot of room for coincidence, particularly in patients who were recurrently suicidal. So could be suicidal one week, okay the next week, suicidal another week. And you could get things occurring by coincidence. So it's hard to take that as definitive proof.

*Id.*

Dr. Healy's citation of the Rothschild study is particularly problematic because after it was published, the authors issued a letter to the editor which refuted the analysis that Dr. Healy now attempts to draw from their work.[47] They explained that their article did not stand for the proposition that fluoxetine causes suicide, but rather that the development of akathisia (as a side effect of fluoxetine) was one of several factors that led depressed patients to attempt suicide.[48]

Use of a small number of challenge-dechallenge studies to test a hypothesis is inadequate and not generally accepted methodology. See *Hollander v. Sandoz Pharm. Corp.*, 95 F.Supp.2d 1230, 1234 n. 10 (W.D.Okla.2000) (three challenge-dechallenge reports insufficient to be of consequence). The Court finds that cases reports—even those gathered and reported as challenge-dechallenge-rechallenge studies—do not represent a generally accepted methodology for evaluating whether Zoloft causes suicidal behavior in otherwise depressed patients.

### c. Meta–Analysis

On April 15, 2000, plaintiffs claimed that through calculations which involved Pfizer's own data, Dr. Healy had confirmed the hypothesis that Zoloft causes suicide. As noted above, according to plaintiffs, his review indicated a "relative risk of suicidal acts on Zoloft, compared to placebo and corrected for exposure times of 2.19 (i.e. 2.31 vs. 1.0555)." Pfizer questions those calculations and has submitted an affidavit which suggests that they are impossible. Indeed, the independent experts have reported that they cannot replicate Dr. Healy's relative risk calculation of 2.19.[49] Armed with this information in advance of

---

**47.** A.J. Rothschild and C. Locke, Reply, 53 J. Clin. Psychiatry 256–57 (July 1992).

**48.** Dr. Rothschild has also signed an affidavit which states that his study did not have a control group, that two of the participants who experienced adverse effects had been nonresponders to other drugs and may have been at a higher risk of suicide regardless of the drug they took, and that his case reports do not causally support an inference that Prozac can lead to suicide because they do not constitute valid scientific evidence on which an opinion regarding causation can be based. See Rothschild Affidavit (Exhibit D) in Reply In Support Of Defendant Pfizer Inc.'s Motion To Exclude The Testimony Of David Healy (Doc. # 536) filed November 1, 2001. Dr. Davis noted that Dr. Rothschild could have withdrawn his conclusion because he "agreed with me that anecdotal information has its limitation and it could be coincidence, and he wanted to make that clear in the affidavit." Transcript (Doc. # 550) at 83–84. On the other hand, he noted that "the drug companies are the major funding of a lot of research, and you never can rule out somebody giving, not wanting to offend a drug company." *Id.* at 84.

**49.** Independent Expert Report (Doc. # 502) at 13. The experts also addressed three exhibits that Dr. Healy had introduced during his deposition on March 27, 2000. See Healy Deposition Testimony And Exhibits (Exhibit 61) in Appendix Of Exhibits (Nos.52–75) To Defendant Pfizer Inc's Pretrial Motions ("Pfizer's Pretrial Ex. Nos. 52–75") (Doc. # 230). The first two exhibits came from a European meeting on neuropsychopharmacology in 1999.

The data in Exhibit 12 came from a study conducted by Dr. David Baldwin regarding the number of suicide attempts in a double-blind, randomized controlled trial involving placebo and paroxetine, another SSRI. The study apparently spanned a six-month period

the Daubert hearing, Dr. Healy made some effort to explain and defend his calculation. When discussing the calculation with Dr. Concato, he explained that he had calculated the number based on patients and not patient years.[50] Even with this information, Dr. Concato could not verify the validity of Dr. Healy's calculation.[51] Dr. Concato and Dr. Davis expressed concern about Dr. Healy's calculation and a desire for Dr. Healy to produce more information to validate the number. As the Court explained, however, Dr. Healy's opportunity to declare the bases for his opinion and produce evidence to support it has come and gone.[52] Because the experts cannot replicate Dr. Healy's calculation based on the information that he timely provided and Dr. Healy does not defend it based on that information, the Court has no alternative but to conclude that it does represent generally accepted methodology.

### d. Koch's Postulates

As noted above, Koch's Postulates are a series of factors which are designed to assist in determining general causation and whether a drug may cause a certain reaction. Reference Manual (1st ed.1994). Because Dr. Healy's conclusion as to general causation is so heavily dependent on his application of Koch's Postulates, the Court asked its independent experts to evaluate this methodology in particular detail. After completing their review, Dr. Concato and Dr. Davis determined that while some elements of his approach were customary and accepted methods of applying Koch's Postulates, other elements were inconsistent with Koch's Postulates and their application.[53] Overall, because Dr. Healy had focused on the association between SSRI drugs and akathisia—rather than the direct association between SSRI drugs and suicide—the independent experts concluded that Dr. Healy's application of Koch's Postulates was not generally accepted by the scientific community.[54] As discussed below, they also cited specific deficiencies of Dr. Healy's methodology in applying the postulates.

and revealed that 2.3 patients per thousand on placebo and 7.5 patients per thousand on paroxetine would attempt to commit suicide. Dr. Healy, who created the graph, did not know exactly how many patients were involved in the trial, other than that it was a low number. He believed that this data showed, however, that SSRI drugs as a class exhibit a propensity to cause suicide. Exhibit 13 is data from a clinical trial of a French anti-depressant, Milnacipran. The exhibit measures suicide attempts per 100 patient years and found that Milnacipran had roughly 7, tricyclic antidepressants had about 9 and SSRIs had around 22. The Court gathers from Dr. Healy's testimony that the data actually comes from a meta-analysis of other studies. Exhibit 14, a graph created by Dr. Healy, measures suicide attempts on fluoxetine based on randomized, controlled trial data from Eli Lilly. In trials involving 8,000 patients, Dr. Healy found 2.5 suicide attempts per thousand patients on placebo, 3.8 suicide attempts per thousand patients on tricyclic antidepressants and 12.5 suicide attempts per thousand

patients on SSRI drugs. Dr. Healy did not know the time period involved in this study. The experts found that none of the figures in Exhibits 12, 13 and 14 conformed to generally accepted methodology. They stated that

> In particular, the numbers of patients in each group are not reported, and the statistical significance of the results (e.g., shown by "error bars") are not provided. In addition, the Y-axis is not defined for Exhibits 12 and 14. (We reserve judgment and comment on the quality of the "data" itself.)

Independent Expert Report (Doc. # 502) at 16.

50. Transcript (Doc. # 552) at 369.

51. *Id.* at 371.

52. *Id.* at 392.

53. Independent Expert Report (Doc. # 502) at 1.

54. *Id.* at 10.

## Strength Of Association

The first postulate concerns the strength of the association between the exposure and effect; it is measured by relative risk. The higher the relative risk, the greater the likelihood that the relationship is causal.[55] See Reference Manual (2nd ed.2000) at 376. "[R]elative risk is one of the cornerstones for causal inferences." *Id.* at 376. As noted above, Dr. Healy concluded with respect to this factor that akathisia is a clear-cut event which is strongly associated with some insult to the central nervous system such as drug intake and, in the case of Zoloft, akathisia may occur in at least a mild form in over 50 per cent of the patients who are taking it. Pfizer challenges Dr. Healy's application of this postulate on two grounds, claiming that Dr. Healy has no scientific evidence that Zoloft patients are at increased risk of akathisia, and that unless Zoloft creates a relative risk of greater than 2.0, Dr. Healy's testimony is inadmissible.

Preliminarily, the Court rejects Pfizer's argument that unless Zoloft is shown to create a relative risk greater than 2.0, Dr. Healy's testimony is inadmissible. According to Dr. Concato and Dr. Davis, the magnitude of relative risk is a continuum and a threshold of 2.0 is an arbitrary cutoff.[56] They explained that even strong associations may turn out to be false and that the rigor of the study design and the quality of the data collection are more important than the precise magnitude of the risk.[57] Furthermore, statistical significance—as expressed by confidence intervals, P values or both—is important in determining the stability of a relative risk calculation.[58]

The Court recognizes that other courts have adopted a 2.0 relative risk calculation as the benchmark for admissibility of expert testimony. See *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n. 16 (11th Cir.1999) (relative risk greater than 2.0 allows inference that agent caused illness; risk of 1.24 insufficient); *Pozefsky v. Baxter Healthcare Corp.*, No. 92–314LEKRWS, 2001 WL 967608 (N.D.N.Y. Aug. 16, 2001) (breast implant plaintiff must show relative risk greater than 2.0). On this record, especially in light of the testimony of its independent experts, this Court declines to do so. See *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 606 (D.N.J.2002) ("[A] relative risk of 2.0 is not so much a password to a finding of causation as one piece of evidence, among others for the court to consider in determining whether an expert has employed a sound methodology in reaching his or her conclusion."); *Pick v. Am. Med. Sys., Inc.*, 958 F.Supp. 1151, 1160 (E.D.La.1997) ("A relative risk above 1.0 is statistically significant, even if not sufficient, by itself, to establish causation by a preponderance of the evidence.").

Pfizer also challenges Dr. Healy's application of this postulate on the ground that

---

**55.** See *In re Breast Implant Litig.*, 11 F.Supp.2d 1217, 1226–27 (D.Colo.1998) (testimony about medical causation only relevant if it shows that conduct of defendant is more likely substantial factor in the plaintiff's injury; must show statistically significant relative risk greater than 2.0); *Wade–Greaux v. Whitehall Lab., Inc.*, 874 F.Supp. 1441, 1452 (D.Vi. 1994) ("A relative risk of '2.00' means that the disease occurs among the exposed population with twice the frequency as the disease occurs among the unexposed population.... It

means that there is a 50% chance that a particular case of the disease was associated with the exposure and a 50% chance that the disease was not associated with the exposure.").

**56.** Independent Expert Report (Doc. # 502) at 12.

**57.** *Id.* at 12–13.

**58.** *Id.*

he has no scientific evidence that Zoloft patients are at increased risk of akathisia. The Court need not address this issue in light of its finding—based on the testimony of its independent experts—that generally accepted methodology in this case required Dr. Healy to consistently test the strength of association between SSRI drugs and suicide (the outcome of interest)—rather than the association between SSRI drugs and akathisia (which is purported to be part of the chain of events that lead to suicide, rather than an independent outcome) or, in other cases, the association between SSRI drugs and improvement in symptoms of depression.[59] Furthermore, as the independent experts explained, determining the strength of association "requires at least two groups of subjects, one exposed to the agent of interest (sertraline), the other not exposed, so that rates of the outcome event (suicide) can be determined and compared," [60]

In concluding that akathisia may occur in at least a mild form in over 50 per cent of the patients who take Zoloft, Dr. Healy reasons as follows: (1) clinical trial data suggest that up to 25 per cent of patients who take Prozac may have "very marked akathisia;" (2) "as a matter of certainty," the method of data collection in clinical trials "significantly under-estimates the extent of the problem;" (3) in the case of SSRI-induced sexual dysfunction, such data collection methods reported an incidence rate of five per cent when the "true incidence is of the order of 50%;" (4) general placebo controlled trials suggest that nervousness and anxiety occur in 10 to 30 per cent of the population taking SSRI drugs; (5) tests by Eli Lilly suggest that

such data collection methods "may underestimate the burden of side-effects by a six-fold factor;" and (6) if this applies to "akathisia spectrum effects" in the case of Zoloft, akathisia "may occur in at least a mild form in over 50% of patients taking the drug. This reasoning says nothing about the extent to which nervousness, anxiety and akathisia appear in the population at large—let alone the population of untreated patients with depression or depressed patients who are treated with non-SSRI drugs." Even if Dr. Healy is not legally required to show a relative risk of at least 2.0, he must rely on studies which yield results that are statistically significant regarding the causal relationship at issue in this case. See *Magistrini*, 180 F.Supp.2d at 605 (expert's failure to adequately address relative risks weighed in court's conclusion that methodology was unreliable); *Siharath v. Sandoz Pharm. Corp.*, 131 F.Supp.2d 1347, 1358 (N.D.Ga. 2001) (expert's failure to derive statistically significant relative risk greater than 2.0 rendered testimony inadmissible). The independent experts were not able to derive statistically significant results from the materials which Dr. Healy provided. For these reasons, the Court must conclude that Dr. Healy did not apply the first of Koch's Postulates in a manner which satisfies *Daubert*.

### Consistency With Other Research

Koch's Postulates ask whether the proposed association is consistent with other research. Reference Manual (2nd ed.2000) at 379. Dr. Healy does not discuss the fact that other research is contrary to his conclusion. According to the independent

---

**59.** Independent Expert Report (Doc. # 502) at 1, 10.

**60.** *Id.* at 4–5. According to the independent experts, RCTs provide an opportunity to assess whether suicide is more common with one agent as opposed to another, or a place-

bo, without the threat of susceptibility bias (confounding) affecting the results. Such trials are useful in calculating relative risks, due to the protection randomization provides against confounding bias. *Id.* at 13. Other types of research design are "less useful." *Id.* at 16.

experts, his failure to do so constitutes a misapplication of Koch's Postulates—which are "commonly applied in the context of other research, including in this case the consideration that depression itself may have led to suicide."[61] Dr. Healy's misapplication of Koch's Postulates is highly material, given the large body of research from RCTs with placebo controls which refute or fail to support his opinions.[62] Dr. Healy has not directly responded to this fact, other than to attack the drug companies who funded and analyzed the data and disavow the need for RCTs and large scale epidemiological studies.[63] This response in itself is apparently inconsistent with generally accepted methodology, which credits the role of RCTs and large-scale epidemiological studies as "very pertinent" in evaluating the relative risks of potential associations between sertraline and suicide.[64] The Court therefore concludes that in failing to discuss the consistency of his hypothesis with other research, Dr. Healy has not used generally accepted methodology.

### Alternative Explanations

Koch's Postulates provide that to avoid reaching an erroneous conclusion, a scientist should rule out alternative explanations. See Reference Manual (2nd ed.2000) at 374. Dr. Healy omitted this factor from his application of Koch's Postulates. Pfizer contends that Dr. Healy has committed a major error in failing to show that Zoloft (as opposed to other factors such as depression itself) causes suicide in depressed patients.

The independent experts stated that "[w]hether or not the concept is identified as a separate postulate, the need to rule out alternative explanations is a fundamental tenet of scientific reasoning," and that Dr. Healy had not given adequate consideration to the possibility of other explanations.[65] Failing to consider alternative explanations is not a generally accepted methodology of applying this postulate.

### Temporal Relationship

According to Koch's Postulates, a temporal relationship is necessary to find a causal relationship. Reference Manual (2nd ed.2000) at 376. "If the exposure occurs after the disease develops, it cannot cause the disease." *Id.* As noted above, Dr. Healy found that akathisia has a fairly predictable temporal onset in relation to the intake of Zoloft, i.e. 24 to 48 hours following the institution of treatment or an escalation of dose (a phenomenon which

**61.** Independent Expert Report (Doc. # 502) at 5.

**62.** The independent experts summarize that data, along with observational studies, in their expert report. *Id.* at 14–15.

**63.** See August 13, 2000 Healy Declaration (Exhibit 91) in Pfizer's Pretrial Ex. Nos. 86–99 (Doc. # 232) at 0000083.

**64.** Independent Expert Report (Doc. # 502) at 5.

**65.** Independent Expert Report (Doc. # 502) at 7. They specifically stated that

In the current context, Dr. Healy does not appear to focus as much attention on other explanations for suicide among patients on SSRIs in general, or sertraline in particular. His article on suicide in the course of treatment of depression (Journal of Psychopharmacology 1999;13:94–99) discusses five possible causal mechanisms. The rest of the article, however, doesn't develop fully the scenario of certain antidepressants being a "marker" for more severe disease, denoting a corresponding risk of suicide, and leading to the problem of confounding ... (In particular, physicians will often avoid prescribing tricyclic antidepressants (TCAs) in suicidal patients because of the danger of a fatal overdose-a small number of TCA tablets can kill. Rather, physicians often prescribe SSRIs, mianserin, or trazodone for such patients-drugs that are safer if taken in overdose.)

*Id.*

builds to a peak over one to two weeks as the drug dosage rises in the body).

Pfizer attacks Dr. Healy's application of this postulate because he claims that SSRIs do not begin treating depression for two to three weeks, but that they cause suicide after one or two weeks of therapy. Dr. Davis testified, however, that it is possible for sertraline to produce negative side effects before it begins to work in a beneficial way.[66]

Pfizer also contends that Dr. Healy also does not show a temporal relationship between Zoloft ingestion and Zoloft-induced suicide as opposed to *depression*-induced suicide. Pfizer concedes that Matthew Miller ingested Zoloft before he committed suicide, but insists that in order to satisfy this postulate, Dr. Healy must definitively show that Zoloft (as opposed to depression) caused the suicide. Pfizer's position begs the question, however, since a definitive answer to this question would render the other Postulates superfluous. The possibility that something other than Zoloft caused Matthew's suicide is addressed by the postulate concerning alternative explanations, and also by arguments about specific causation. Dr. Healy's proffered testimony satisfies the generally accepted methodology for this postulate.

## Biological Plausibility

Under Koch's Postulates, the factor of biological plausibility can be difficult and "depends upon existing knowledge about the mechanisms by which the disease develops." Reference Manual (2nd ed.2000) at 378. "The saliency of this factor varies depending on the extent of scientific knowledge about the cellular and subcellular mechanisms through which the disease process works." *Id.* As to this factor, Dr. Healy stated that there appears to be a "clear biological mechanism" by which SSRI drugs produce akathisia. He does not identify this "clear biological mechanism," other than to state that it can be "blocked or ameliorated" through other drugs. Pfizer notes that in applying this factor, Dr. Healy connects Zoloft and akathisia rather than Zoloft and suicide, and that his expert reports reveal no discussion that directly connects akathisia (or Zoloft) to suicide.

Dr. Concato and Dr. Davis noted that Dr. Healy's method of determining biological plausibility—that Zoloft leads to akathisia and emotional blunting which in turn causes suicide—may be a suitable explanation *if* there is a relationship between sertraline and suicide.[67] Dr. Healy provided no explanation regarding the biological plausibility of his theory that Sertraline causes *either* akathisia or suicide. His application of this postulate does not constitute generally accepted methodology.

## Specificity Of Association

Under Koch's Postulates, specificity of association will be found if exposure to the agent is only associated with a single disease. See Reference Manual (2nd ed.2000) at 379. Lack of specificity of association does not necessarily undermine the case for causation when there is a biological explanation for its absence.[68] *Id.* This factor can be helpful, however, in strengthening the case for causation. *Id.*

---

**66.** Transcript (Doc. # 550) at 46–47.

**67.** *Id.* at 1. Although Dr. Davis opined that akathisia is unpleasant and may play a role in suicide, he also expressed concern during the Daubert hearing as to whether emotional blunting could cause suicide. Transcript at (Doc. # 550) 36–37.

**68.** Tobacco, for example, is linked with many health hazards and therefore lacks specificity. See Reference Manual (2nd ed.2000) at 379. The biological explanation for this, however, is that tobacco and cigarette smoke consist of numerous harmful agents and exposure to multiple agents may lead to multiple side effects. *Id.*

In addressing this factor, Dr. Healy determined that not all antidepressants appear capable of producing akathisia and that "there is ... greater specificity in the relationship between an SSRI and akathisia than there is between the SSRI and the response of a depressive disorder." In other words, Dr. Healy admits that not all antidepressants cause akathisia. From the record, it appears that even specific classes of antidepressants (such as SSRI drugs) do not all produce akathisia. In fact, SSRI drugs which may appear to produce akathisia in some patients at certain doses at certain times do not have that effect on other patients. In applying this postulate, Dr. Healy does not pretend to address any association between akathisia and suicide or Zoloft and suicide. The Court must therefore conclude that he has not used generally accepted methodology in addressing this postulate.

**Dose Response Relationship**

This postulate addresses that idea that the more intense the exposure to a particular agent, the greater the risk of disease. See Reference Manual (2nd ed.2000) at 377. Some agents do not exhibit a dose-response relationship when there is a threshold phenomenon (the exposure must exceed a certain dose to produce the disease). See *id.* Therefore this factor may be helpful, but it is not essential in proving causation. See *id.* As to dose-response relationship, Dr. Healy stated that there appears to be a clear dose-response rela-

tionship between SSRI intake and akathisic phenomena. Again, however, he does not address a dose-response relationship between SSRI drugs and suicide. In this regard he has not used a generally accepted methodology in his analysis of this postulate.

**Additional Factors**

In applying Koch's Postulates, Dr. Healy added four factors which Mr. Koch himself did not include: salience of association, consistency of association, support by experiment and support by analogy. In its initial analysis of Dr. Healy's work, the Court was unsure whether these factors have been or currently are part of Koch's Postulates.[69] Dr. Concato and Dr. Davis found that Dr. Healy's additional postulates were unnecessary, however, and merely repeated information which was addressed in already-existing postulates.[70] Thus, utilizing these postulates does not constitute generally accepted methodology.

As noted above, as to salience of association (which he explained as "the difficulty in otherwise explaining the effect"), Dr. Healy stated that the association between SSRI drugs and akathisia may be "very salient," in that the patient may be visibly distressed and clearly deteriorated "with no ... means of explaining what is happening other than by invoking an action of a drug." The independent experts noted that in this context, "salience of the association" appears to invoke a criterion of

**69.** The postulates have changed over the years. Certain factors, such as the existence of a dose-response relationship and specificity of the association, are no longer very significant and may not be applicable in some situations, while other factors are sometimes added. See Reference Manual (2nd ed.2000) at 377, 379; Independent Expert Report (Doc. # 502) at 9–10, compare Reference Manual (1st ed.1994) with Reference Manual (2nd ed.2000) (later edition adds replication of findings and cessation of exposure). The in-

dependent experts noted that although application of the postulates cannot be simplified to the extent of identifying more important or less important factors for all circumstances, the postulates were not meant to be used in a one-size-fits-all manner and certain factors may be less applicable in certain situations. Independent Expert Report (Doc. # 502) at 9–10.

**70.** Independent Expert Report (Doc. # 502) at 8–9.

"obvious" cause and effect (e.g., an anaesthetic and falling asleep). Koch's Postulates were developed and applied in the context of chronic diseases, however, for which the association of cause and effect was not obvious. As such, this factor per se is not a part of Koch's Postulates. Rather, in a more general sense, the existing postulates (such as temporal association) may be said to address the overall salience of the association.

As to support by experiment, Dr. Healy cited his Healthy Volunteer Study, stating that in his tests, healthy volunteers who took droperidol became akathisic and up to five became suicidal with two becoming acutely suicidal within hours of treatment. Dr. Healy posits that this experiment constitutes "strong evidence" in favor of the proposed mechanism of action whereby an SSRI drug may produce suicidality. The independent experts explained that "support by experiment" is not a category of Koch's Postulates because experiments generate information for other (existing) postulates but do not constitute postulates unto themselves. Therefore Dr. Healy's approach would tend to provide an indirect and possibly vague endorsement of a proposed cause and effect association.

As to support by analogy, Dr. Healy states that according to case reports, patients on Reserpine (a drug active on the serotonin system which "probably causes akathisia by similar mechanisms to Zoloft") and Prozac (another SSRI drug) committed suicide even though they were "not depressed at all" and had "no nervous condition on which the suicide could be blamed." According to Dr. Healy, these case studies by analogy provide "strong evidence" of a causal relationship between SSRI intake and suicidality. According to the independent experts, "support by analogy" appears to be a variation on the postulates that address biological plausibil-ity and coherence with existing information, and it does not appear to be necessary.[71]

Finally, Dr. Healy has added a factor called "consistency of association." In applying it, he states that akathisia has a physiological input which appears to occur across all personality types, and akathisia in response to a particular agent strongly predicts renewed akathisia on further exposure to the triggering agent. Given his failure to address the direct linkage between Zoloft and suicide and the overwhelming deficiencies in his application of Koch's Postulates, the addition of this extraneous factor is perhaps best characterized as harmless error. In any event, the Court concludes that it is subsumed in established factors and that it does not constitute any part of a generally accepted methodology for applying Koch's Postulates.

In summary, Dr. Healy has misapplied, failed to satisfy, or failed to address six of the seven postulates (strength of association, consistency with other research, alternative explanations, biological plausibility, specificity of association and dose-response relationship). To compound this problem, he has invented other factors and variously applied or misapplied them in ways which make it impossible to discern what his conclusions would be if they rested only on generally accepted methodology. Dr. Healy adequately addressed only one of the postulates (temporal relationship). While "[t]here is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on the guidelines," see Reference Manual (2nd ed.2000) at 375, the Court concludes by overwhelming evidence that Dr. Healy's application of the postulates is not generally accepted meth-

---

odology. In their report the independent experts issued the follow conclusion: [72]

> The theory that sertraline increases the risk of suicide rests largely on case reports of suicide among patients taking sertraline, a posited connection between akathisia (as a side effect of sertraline use) and suicide, and the report of suicidal ideation in two healthy volunteers given sertraline. These "lines of evidence" only partially satisfy Koch's postulates.

In reviewing the Daubert factors, the Court finds that the flaws in Dr. Healy's methodology—particularly his Healthy Volunteer Study, his Meta–Analysis of Pfizer data and his application of Koch's Postulates—are glaring, overwhelming and unexplained, and that his testimony on general causation (which is premised on those methodologies) must therefore be excluded from evidence. Consideration of such evidence would only serve to confuse and mislead the jury and waste the time and resources of the parties and the Court. Plaintiffs concede that Dr. Healy has not cited the Hindmarch Study as a basis for his expert opinion and that they will not cite that study as part of their case in chief on the issue of general causation. That leaves Dr. Healy with a handful of case reports to substantiate his distinctly minority position that to a reasonable degree of medical certainty, Zoloft causes otherwise depressed patients to commit suicide.

The Court has already determined that heavy reliance on case reports is not an accepted methodology for determining the strength of association between Zoloft and suicide. The Court therefore has no alternative but to sustain Pfizer's motion to prohibit Dr. Healy's testimony on the subject of general causation and to prohibit plaintiffs from using at trial the Hindmarch Study, the Healthy Volunteer Study and the Pfizer Meta–Analysis.

## B. Specific Causation

■ Dr. Healy proposes to testify as to specific causation: that in his opinion, based on a review of notes by Matthew, reports by Matthew's father, and the deposition of Matthew's psychiatrist, Zoloft more likely than not caused Matthew to commit suicide and no other factor in his background or psychosocial situation could explain his suicide.[73] Pfizer argues that Dr. Healy's testimony is not adequate to show specific causation and that at the time of his deposition on March 27, 2000, Dr. Healy had not even bothered to review much of the factual evidence regarding Matthew's symptoms, behavior and social and family circumstances.

Indeed, Dr. Healy's contention ignores undisputed evidence that Matthew Miller engaged in suicidal thoughts and behavior before he first took Zoloft. Plaintiffs took Matthew to see a psychiatrist because he had been struggling with mood, anger and school-related issues.[74] In a diagnostic

---

**72.** Independent Expert Report (Doc. # 502) at 18.

**73.** Dr. Healy stated that he had looked at details in Matthew's notes (including a note that Matthew wrote about his feelings regarding the family's move to a new neighborhood), read reports prepared by Matthew's father, and reviewed the deposition of Dr. Douglas Geenens, the psychiatrist who prescribed Zoloft for Matthew. See Exhibit 2 in Plaintiffs' Pretrial Ex., Vol. I (Doc. # 368) at ¶ 13. Dr. Healy contends that suicide is a "vanishingly rare" event for a 13 year-old boy

and that no factor beside Zoloft can explain his suicide.

**74.** Exhibit 39 in Plaintiffs' Pretrial Ex., Vol. II (Doc. # 369) at 24:12–23, 101–109 (reasons Matthew began seeing Dr. Geenens; Matthew had suspensions for vandalism, bullied other children); see also Exhibit 72 in Pfizer's Pretrial Ex. Nos. 52–75 (Doc. # 230) filed April 18, 2000 (grade cards indicating growing difficulty with school).[75]

**75.** On April 28, 2000, plaintiffs moved to exclude hearsay statements in school records or from witnesses about Matthew being violent or suicidal. See Plaintiffs'

consultation, Matthew told the psychiatrist that although he would not do it, he had thought about killing himself.[76] On the second visit with the psychiatrist, plaintiffs said that even though things were going well, Matthew was still irritable, socially withdrawn, in a low mood, and used profanity.[77]

Upon reviewing case material, Dr. Morton Silverman, plaintiffs' expert on suicidology, concluded that based on difficulties with interpersonal relationships, preoccupations with sexual topics, declining school performance and episodes of aggression, Matthew had three risk factors for suicide: diagnosis of depression, being a white male and having a school referral for counseling.[78] In addition, the day before Matthew's death, one of his best male friends had moved; he apparently was Matthew's only male friend in his grade at his new school, and Matthew seemed depressed about the move.[79] The incidence of suicide in Matthew's age group is not—as Dr. Healy would have the Court and the jury believe—"vanishingly rare." Dr. Concato and Dr. Davis cited information from National Alliance for the Mentally Ill that based on 1996 data, suicide is the fourth leading cause of death among ten to 14 year-olds.[80]

From the outset, the Court has entertained concerns about the degree of Dr. Healy's reliance on pre-selected evidence from interested parties, to the exclusion of reliable evidence that Matthew engaged in suicidal thoughts and behavior before he first used Zoloft. The Court therefore asked its independent experts whether selective reliance was consistent with generally accepted methodology on this issue. Their response was predictable and well-founded within the bounds of the case law under Daubert: "the exclusion of evidence

Motions In Limine Nos. 1–7 And Memorandum And Suggestions In Support Of Plaintiffs' Motions In Limine (Doc. # 246). On September 5, 2001, the Court held a telephone hearing and sustained plaintiffs' motion. See Minute Sheet (Doc. # 500). Even so, the Court may still utilize school records that are not hearsay (or are hearsay exceptions) in its ruling. Grade cards that schools keep in the ordinary course of business are exceptions to the hearsay rule under Fed.R.Evid. 803(6). See, e.g., *Roberts v. Bowersox*, 61 F.Supp.2d 896, 931 (E.D.Mo.1999) (defendant successfully introduced his school records under business record exception to hearsay). In addition, the information relied upon by Dr. Geenens need not be admissible at trial for the Court to examine the bases for his decision that Matthew's mental state warranted medication. See Fed.R.Evid. 703 (bases for opinion testimony need not be admissible). Rule 702 mandates that the Court determine the admissibility of expert testimony, but Rule 703 allows for opinion testimony to be based on inadmissible evidence. Logically, whether or not the actual testimony will be admissible at trial, the Court may learn about potentially inadmissible testimony in reviewing the

material that the expert did (or did not) base his opinion upon.

**76.** Exhibit 39 in Plaintiffs' Pretrial Ex., Vol. II (Doc. # 369) at 22:1–6.

**77.** *Id.* at 43.

**78.** See Exhibit 66 in Defendant's Exhibits Nos. 52 To 75 (Doc. # 230) at 5. On April 18, 2000, Pfizer moved to exclude the testimony of Dr. Silverman. See Defendant Pfizer Inc.'s Motion To Exclude Opinion Testimony Of Morton M. Silverman (Doc. # 200). On June 26, 2000, the Court issued a Memorandum And Order (Doc. # 200) which sustained in part and overruled in part Pfizer's motion. Specifically, the Court found that Dr. Silverman was qualified to testify regarding the existence of both risk factors and protective factors for suicide. See id. at 5.

**79.** See Exhibit 84 in Defendant's Exhibits Nos. 76 To 85 (Doc. # 231) at 14–16; Exhibit 39 in Plaintiffs' Pretrial Ex., Vol. II (Doc. # 369) at 39–40.

**80.** Independent Expert Report (Doc. # 502) at 6.

is not generally accepted practice" because researchers typically evaluate information from relevant sources and consider it when assessing a cause and effect relationship.[81] Stated otherwise, obtaining information from sources that support, refute or are neutral regarding the hypothesis is appropriate to minimize the likelihood of a false conclusion.[82] Dr. Davis noted that it is difficult to know exactly how much information to explore: [83]

> It's always a matter of how thorough you want to be. And I don't think there's any black or white. I think if the patient kept a diary of their events, what was in their mental process, that might be very relevant to look at and might be a significant admission. Sometimes if things are very clearcut, there might be an answer. It might be irrelevant to explore all of the odd things. Any avenue you don't explore, people can claim you weren't thorough enough. And the question is how much is enough and I don't know.... But I would certainly like to know what was in the patient's mind before the suicide if there was any diary or notes before.

Dr. Healy has given scant attention to evidence of factors—other than Zoloft—which may have caused Matthew's suicide. Dr. Healy's testimony on specific causation does not satisfy Rule 702 because it does not utilize sufficient facts and data and it is not the product of reliable principles and methods. Moreover, because the Court has sustained Pfizer's motion to preclude Dr. Healy from testifying as to general causation, and Dr. Healy is plaintiffs' only expert on the subject, the issue of specific causation is for all practical purposes moot. The Court therefore finds that Dr. Healy's testimony on the issue of specific causation is inadmissible.

## C. Dr. Healy's Areas Of Expertise

■ Pfizer argues that Dr. Healy may not give testimony on suicidology, warning labels or the FDA regulation of pharmaceuticals because those areas are outside the scope of his expertise. The law is clear that "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir.2001) (orthopedic surgeon and oncologist not qualified to testify regarding warnings on intramedullary nailing device). Plaintiffs thus have the burden of establishing the admissibility of Dr. Healy's opinions. *Id.* at 970 n. 4.

### 1. Suicidology

As noted above, Dr. Healy is an eminent psychiatrist and neuropsychopharmacologist who has specialized in the areas of depression and psychiatry throughout his career; he has made many important clinical contributions, along with important contributions to the history of psychiatry, and is an accomplished researcher in the area of neuropsychopharmacology. Pfizer nonetheless faults Dr. Healy's expertise with regard to suicidology because Britain does not have a suicidology association and Dr. Healy has only conducted one clinical study in the area. Plaintiffs contend that Dr. Healy is competent to testify about suicide because he has conducted extensive study and publication in the area and his work has clearly touched upon areas which involve suicide or suicidal ideation as a negative outcome (his work involving SSRI drugs in particular).[84]

---

**81.** *Id.* at 8.

**82.** *Id.*

**83.** Transcript (Doc. # 550) at 76.

**84.** Dr. Healy submitted a declaration that he has proposed a symposium on Psychotropic Drug Associated Suicidality to the British Association for Psychopharmacology and it has been accepted. Exhibit 2 in Plaintiffs' Pretrial Ex., Vol. I (Doc. # 368) at ¶ 62. Dr.

As to suicidology, the Court is not certain what the gist of Dr. Healy's expert testimony would be-especially given the Court's rulings with regard to Dr. Healy's views on general causation and specific causation. Even so, the Court is unimpressed with Pfizer's argument. Rule 702 does not require that Dr. Healy be the preeminent suicidologist in the world, merely that he be able to offer an opinion that will assist the trier of fact, is based upon sufficient facts or data, is the product of reliable principles and methods, and has applied the principles and methods reliably to the facts of the case. Except as to the issues whether Zoloft generally causes suicide and whether Zoloft caused Matthew Miller in particular to commit suicide, Pfizer has not seriously called into question Dr. Healy's expertise on suicidology. Particularly since the Court is not informed what specific opinions Dr. Healy might offer on other points, it declines to determine in advance of trial that Dr. Healy cannot satisfy Rule 702 because he lacks sufficient expertise on the issue of suicide.

## 2. Warning Labels

Based on his experience as a practicing physician who prescribes Zoloft and has written extensively about the dangers of SSRI-induced suicide, Dr. Healy proposes to testify that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide. Plaintiffs argue that because he is a practicing physician who prescribes Zoloft and has written extensively about the need for warnings regarding the dangers of SSRI-induced suicide, Dr. Healy is competent to testify that Zoloft warning labels are inadequate. Pfizer contends that Dr. Healy has no experience, training or education that make him an expert in United States prescription drug

warnings and that he cannot say what specific words would make a warning adequate.

As an initial matter, the fact that Dr. Healy prescribes SSRI drugs and studies whether they tend to induce suicidal ideation and behavior does not necessarily render him an expert on the adequacy of warnings for SSRI drugs. In *Ralston*, 275 F.3d at 970, the Tenth Circuit held that an orthopedic surgeon and oncologist was not qualified to testify about warnings concerning an intramedullary nailing device— a device designed to hold together pieces of fractured bones. Plaintiff alleged that the manufacturer had not properly warned her treating physician that one of its devices was more durable than another. Her expert was not allowed to testify that the warnings were inadequate, however, because although she dealt with the devices, her real area of expertise was bone healing and oncology. *Id.* at 969. In affirming the district court, the Tenth Circuit held that the dispositive question is whether the adequacy of the warning is within the reasonable confines of the expert's subject area. *Id.* at 970. There, the expert had not researched the device or published articles about it, and had never drafted or been asked to draft a surgical technique or warning of any kind. *Id.* The Tenth Circuit noted that "[w]hether or not a given warning is adequate depends upon the language used and the impression that it is calculated to make upon the mind of an average user of the product." See *Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir.1998) (citations omitted) (ceramics expert who could testify about manufacturing defect not qualified to testify about warning since it involved "[q]uestions of display, syntax, and emphasis"). Perhaps Dr. Healy can supply helpful testimony in this

---

Healy's more recent work has particularly reflected his interest in the issue of treatment-

induced suicide. *Id.*

limited area, by explaining what effect a given warning might communicate to an average physician, but he cannot testify as to the ultimate issue and opine that the warnings were inadequate as a matter of his expert opinion and that he could design a better warning. See *id.* (error to admit opinion testimony on ultimate issue of fact that warnings were "completely inadequate" when expert was not qualified in area of warnings).

The issue is complicated, however, by the fact that the Court has already determined that Dr. Healy will not be allowed to testify that Zoloft causes akathisia, which in turn causes suicide in depressed patients. The Court is therefore somewhat at a loss to determine what expert testimony Dr. Healy might offer on the subject of warnings. If the jury will hear no evidence that Zoloft causes suicide, it cannot possibly conclude that Zoloft labels do not adequately warn against the danger that Zoloft causes suicide. Therefore, even if Dr. Healy could supply helpful testimony in the limited area of explaining what effect a given warning might communicate to an average physician, that testimony would essentially be irrelevant to any larger issue in the case.

Furthermore, Dr. Healy's admits that he "would not hold [him]self up as the world authority as to just what wording should be put in, but I do not believe that the warnings were adequate."[85] Dr. Healy did propose four definitions of akathisia that he believed would have been reasonable to include in a Zoloft label.[86] When asked if anything else would suffice, however, Dr. Healy testified that

> [y]ou would need an expert in—obviously companies hire legal experts in when

they're constructing the labeling to work out the legal implications of what they put in. You would ideally need—if you are going to do an educational job with the labeling, that you would ideally need someone who was an educator in public communication to work out what the best words would be; and working from the kind of materials that I have offered you, I will be happy with whatever words such person came up with.[87]

Dr. Healy has not drafted any sort of proposed warning; without any data or research regarding their potential efficacy, he has merely offered phrases that he thinks might be reasonably included. This fact weighs heavily against a finding that Dr. Healy is a qualified warnings expert. See *Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 539 (7th Cir.2000) (failure to draft proposed alternative warning renders opinion inadmissible; opinion merely "talking off the cuff"); *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1084 (8th Cir.1999) (failure to design warning, much less test its effectiveness rendered proffered expert testimony inadmissible; proximate cause also problematic on different grounds); *Milanowicz v. The Raymond Corp.*, 148 F.Supp.2d 525, 541 (D.N.J.2001) (reliability of expert testimony extremely questionable when he failed to design and test proposed warning and could not point to contrary industry practice).

While plaintiffs claim that Dr. Healy has written extensively on the subject of warnings, the cited articles do not necessarily lead to that conclusion. The first two articles mention warnings in passing, but they do not reveal that Dr. Healy possesses any particular expertise on the topic.[88] The third article is actually a guest editorial

---

**85.** See Exhibit 61 in Pfizer's Pretrial Ex. Nos. 52 To 75 (Doc. # 230) at 314–42.

**86.** *Id.*

**87.** *Id.* at 347:12–22.

**88.** D. Healy, et al., Suicide In The Course Of The Treatment Of Depression, 13 J. Of Psychopharmacology 1, 94–99 (1999), and D. Healy and A. Boardman, Suicide Risk In Affective Disorders. Time To Revise Our Estimates?, (submitted for publication), The first

which posits that pharmaceutical companies avoid posting warnings by relying on physicians to tell their patients the risks of the drugs, but it likewise reveals no special expertise in the area of warnings.[89] Ultimately, plaintiffs do not meet their burden of showing that Dr. Healy possesses knowledge that would allow him to opine on the subject of warnings. Thus his testimony on the matter of warnings is inadmissible.

### 3. FDA Regulations

Finally, based on his familiarity with the American regulatory system, Dr. Healy proposes to testify about FDA regulation of SSRI drugs in general and sertraline in particular. As with his testimony about suicidology, the precise scope and content of his proposed testimony is unclear. Plaintiffs argue that even though Dr. Healy practices in the United Kingdom, he is very familiar with the American regulatory system and can testify regarding the FDA regulation of SSRI drugs in general and sertraline in particular. Specifically, Dr. Healy has written a book that discusses FDA regulations;[90] published interviews with Dr. Paul Leber, the former FDA chief regulator for psychoactive drugs; and in his role as secretary of the British Association of Psychopharmacology, organized and hosted an educational program which involved regulators from all over the world. While other individuals might have more specific expertise than Dr. Healy in the area of FDA regulations, Pfizer has not seriously called into question the fact that he does have expertise and experience which might assist the jury in evaluating the evidence before it. Particularly since the Court is not informed what specific opinions Dr. Healy might offer in this area, it declines to determine in advance of trial that Dr. Healy cannot satisfy Rule 702 because he lacks sufficient expertise on the issue of FDA regulations which would enable him to offer admissible opinions on that subject.

### II. Plaintiff's Post Hearing Memorandum, And Request For Independent Expert Verification (Doc. # 545)

Plaintiffs ask that the Court order the independent experts to evaluate and verify a relative risk calculation from data available in the Myers Report. The Myers Report summarizes the sertraline safety data that Pfizer prepared for the PDAC of the FDA and submitted on September 14, 1990. Plaintiffs argue that Pfizer tendered this exhibit after the experts had left the Daubert hearing and that the calculation which they request would yield a relative risk calculation of 3.01 for Zoloft, relative to placebo.[91] Pfizer asserts that

---

article alludes to warnings in mentioning that "there is an increasing onus on prescribers and companies to acquaint themselves with the hazards of treatment, to inform the patient on how to handle these [side effects] and to monitor the impact of treatment." The second article focuses on whether the lifetime prevalence rate for suicide in affective disorders is an overestimate and does not appear to directly address warnings at all.

**89.** D. Healy, A Failure To Warn, 12 Int't J. Of Risk & Safety 151–56 (1999).

**90.** The Antidepressant Era (1998).

**91.** In part, plaintiffs complain that Pfizer massaged its data by calculating it in terms of patient years and not on a per patient basis. Numbers based on a patient year analysis might be artificially low since a patient who committed suicide soon after beginning treatment would not contribute that many years to the study, as compared to a patient who successfully took Zoloft for a number of years. The Court notes, however, that the experts had access to the Ryder Report, a 1992 Pfizer document that discusses suicide attempts and ideation in the sertraline depression treatment program, which analyzes the data per patient and not per patient year. Transcript (Doc. # 550) at 74.

plaintiffs and Dr. Healy had the Myers Report for three years before the hearing, that Dr. Healy relied on it in his declaration of May 9, 2000, that it was provided to the independent experts, and that Dr. Healy and the independent experts testified about it at length during the *Daubert* hearing in this case. When he formulated his expert opinions in this case, however, Dr. Healy did not make a relative risk calculation using that data. Pfizer argues that now—long after Dr. Healy's numerous expert reports, Dr. Healy's deposition, scrutiny of Dr. Healy's methodology by the independent experts and a two-day *Daubert* hearing—plaintiffs want to bootstrap into the record entirely new calculations of relative risk. Pfizer asks the Court to deny plaintiffs' request.

However else plaintiffs may have obtained a copy of the Myers Report, the Court notes that it is contained in defendant's exhibits to pretrial motions which it filed April 18, 2000.[92] Plaintiffs presumably received a copy of these exhibits, including the Myers Report. Plaintiffs have previously argued that Pfizer inundated them with paper, making it difficult to separate the wheat from the chaff. In this instance, however, Pfizer relied on the report in its pretrial motions. Even though it filed 99 exhibits with its motions, plaintiffs cannot argue that the report was buried in the bottom of a box or hidden in a cavernous storage area. Any calculations that they and Dr. Healy wanted to make from this report could—and should—have been made *well before* this point in the litigation. Although the record is not entirely clear on this point, Dr. Healy's Meta–Analysis apparently relied on information from the Myers Report, as well as data from unspecified sources.

The parties also submitted the Myers Report to the independent experts. As noted earlier, the independent experts have already tried to perform the very calculations that plaintiffs seek, and they report that they cannot verify Dr. Healy's calculations from the data in the report.[93] Finally, Dr. Healy's testimony has been a moving target throughout this litigation and, as Pfizer notes, the Court tried to curtail *further* movement during the Daubert hearing by repeatedly telling plaintiffs' counsel that

> Dr. Healy's testimony would be limited to the reports and affidavits which he has previously submitted and which were made available to the Court's experts. The one exception to that would be with regard to scientific developments that occurred after the time that the record was put together in this case and information that the Court's experts either might have taken into account or that Dr. Healy might have taken into account that was not available to him at the time of the original expert reports. Outside of the scope of that exception would be information which was available to him that was available to [plaintiffs] but [they] just didn't send to him or information which he had but chose not to use at that time.[94]

Plaintiffs' counsel admitted that the graphs and calculations which he sought to introduce were not based on new scientific developments or new information from the experts. The Court therefore finds that Pfizer's opposition to plaintiffs' motion has merit. Therefore, although it is not prepared to give plaintiffs an award for creative ways of avoiding the Court's ruling as to the scope of the evidence it would con-

---

**92.** See Exhibit 12 in Appendix Of Exhibits (Nos.1–25) To Defendant Pfizer Inc's Pretrial Motions ("Pfizer's Pretrial Ex. Nos. 1–25") (Doc. # 228) filed April 18, 2000.

**93.** Transcript (Doc. # 550) at 70–71.

**94.** Transcript (Doc. # 551) at 213:9–24.

sider at the *Daubert* hearing, it also is not prepared to sanction them for over-zealous advocacy. The Court therefore overrules plaintiffs' request for independent expert verification of the figures they request.

### III. Motion For Sanctions Against Dr. Healy (Doc. # 534)

Pfizer asks the Court to sanction Dr. Healy for violating the protective order in this case.[95] During the *Daubert* hearing, the Court heard oral argument and evidence on this motion. As a sanction for violation of the protective order in this matter, Pfizer urges the Court to disqualify Dr. Healy as a witness. In its motion, Pfizer also asks the Court to (1) preclude plaintiffs from using the Hindmarch study at trial, (2) direct plaintiffs and their counsel to identify all other protected materials that Dr. Healy has disclosed, (3) direct plaintiffs and their counsel to retrieve all copies and notes of protected materials from Dr. Healy, (4) seal the declaration of Dr. Healy which is attached to plaintiff's supplemental response to the Court's show cause order (Doc. # 458) filed September 11, 2000, and (5) award costs and fees associated with the motion. On November 20, 2001, however, counsel for Pfizer told the Court that "[i]f Your Honor grants our *Daubert* motion, then that will take care of the matter."[96] Although the Court has already determined that defendant's *Daubert* motion should be granted in part and that Dr. Healy's testimony not admitted on the subjects of general causation, specific causation and warnings, it is not prepared to entirely exclude Dr. Healy's testimony

based on *Daubert*. The Court will therefore analyze the merit of Pfizer's motion.

The protective order states that "[c]onfidential information shall not be used or shown, disseminated, copied, or in any way communicated, orally or verbally, to anyone for any purpose whatsoever, other than as required for the preparation and trial of this action."[97] During the course of discovery, Pfizer produced to plaintiffs an unpublished document by Dr. Ian Hindmarch titled A Double–Blind, Placebo–Controlled, Cross–Over Study To Assess The Effects Of Sertraline, Alone And With Diazepam, On Psychomoter Performance. The so-called Hindmarch Study involved healthy volunteers who had been given sertraline. The study had to be aborted, however, because of a mini-revolt among the subjects—who felt that they could not function on sertraline. Pfizer contends that Dr. Healy violated the protective order by disclosing the existence of the Hindmarch study in two letters to the Medicines Control Agency ("MCA"), the British counterpart to the FDA, dated August 3, 2000 and September 1, 2000. On October 11, 2000. Dr. Healy's letter was discussed in a British publication, in an unsigned article titled *MCA Wants SSRI Suicide Warning*, Scrip: World Pharm. News at 2–3 (Oct. 11, 2000). The article stated as follows:

> In his letter, Dr. Healy highlighted two studies showing that healthy volunteers exhibited signs of suicidal thoughts after takings SSRIs. One of these studies was performed by Professor Ian Hindmarch, the other by Dr. Healy himself. The Hindmarch study was performed about 10 years ago in the UK and was sponsored by Pfizer. The study looked at Pfizer's sertraline, but has never been

---

**95.** See Minute Sheet (Doc. # 91) filed December 16, 1999 (motion for protective order sustained).

**96.** Transcript (Doc. # 552) filed on November 30, 2001 at 474:9–11.

**97.** Protective Order (Doc. # 81) file December 17, 1999 at ¶ 4.

published, and as it was strictly confidential Dr. Healy said he could not provide *Scrip* with further details. However, he did claim that the MCA has seen the study, but consider that the number of volunteers in it was too small to show any conclusive results.

Plaintiffs contend that Dr. Healy only divulged information which he had learned from conversations with Dr. Hindmarch before he received the confidential document in this case, and that he did not divulge information gleaned from confidential documents in this case. Specifically, Dr. Healy testified that he saw Dr. Hindmarch at a meeting in Prague in 1998 and mentioned an article in the New Yorker in which the author compared the effects of Zoloft to drinking 55 cups of black coffee. Dr. Hindmarch allegedly expressed interest in the article and mentioned that his interest stemmed from a similar experience with patients in a healthy volunteer study that he had conducted (the Hindmarch Study). After his own Healthy Volunteer Study in 1999, Dr. Healy called Dr. Hindmarch to get more information about the Hindmarch study. Dr. Healy claims that Dr. Hindmarch then divulged all of the details that Dr. Healy later mentioned in his letter to the MCA.[98]

Dr. Hindmarch testified that in Prague, in 1998, he in fact discussed the black coffee article and a Zoloft study with Dr. Healy. Dr. Hindmarch testified, however, that he was referring to a *different* Zoloft study—one which was published. Dr. Hindmarch did not remember discussing the unpublished study and in his conversation with Dr. Healy in Prague, he may or

may not have stated that he was discussing a published study. Dr. Hindmarch also testified that Dr. Healy called him at his home after he had completed his own Healthy Volunteer Study, and asked for information regarding Dr. Hindmarch's study. Dr. Hindmarch assumed that Dr. Healy was referring to the unpublished study (which had been aborted). He was surprised that Dr. Healy knew about the study and told Dr. Healy that he was well informed. Dr. Hindmarch then gave Dr. Healy details about the study. At some period after this conversation, Dr. Healy received the Hindmarch Study from Pfizer with the confidential designation.

Pfizer first argues that two declarations by Dr. Healy prove that he only learned of the confidential study from Pfizer documents. The first declaration, dated August 31, 2000, swore that "[h]ad I been aware of the Hindmarch study before conducting my study, the situation would have been different and certainly would have given me food for thought. I would have raised the possibility with the healthy volunteers but, in point of fact, the possibility of them becoming suicidal was not mentioned to any of them." According to Pfizer, this declaration shows that (1) Dr. Healy would have told his healthy volunteers about the Hindmarch Study (and the possibility of suicide) if he had known about the study in 1999, when he did his study; (2) Dr. Healy did not so warn his volunteers; (3) therefore, Dr. Healy must have learned about the Hindmarch Study through confidential documents in this case—and not, as he claims, in Prague in 1998. On the other

---

**98.** Plaintiffs also point out that although Dr. Healy and defense counsel discussed the Hindmarch Study at length during Dr. Healy's deposition, the deposition has not been sealed or marked confidential and it is therefore a matter of public record. In addition, plaintiffs assert that defense counsel "virtually invited" Dr. Healy to share his concerns with

a regulatory body; that Dr. Healy shared only what he learned from Dr. Hindmarch himself; that Dr. Healy shared his information in a way that demonstrated his knowledge that the Hindmarch Study results were confidential; and that after he sent the letter, Dr. Healy learned that the MCA already had a copy of the allegedly confidential study.

hand, the second declaration, dated October 30, 2000, swore that Dr. Healy first learned of Dr. Hindmarch's healthy volunteer study in 1998—before his own Healthy Volunteer Study.

Although Pfizer's explanation is plausible, Dr. Healy's testimony at the hearing shows that these statements are reconcilable. Dr. Healy's testimony was that before his own Healthy Volunteer Study, he knew that Dr. Hindmarch had conducted a healthy volunteer study that involved patients having reactions akin to drinking 55 cups of coffee. After his own study was done, but before he received Pfizer's confidential document, Dr. Healy learned details about Dr. Hindmarch's work which suggested that patients believed they could not function on Zoloft.

Pfizer also contends that Dr. Healy's deposition testimony shows that he did not learn of the Hindmarch Study until he received the confidential documents from Pfizer. The Court has reviewed this deposition testimony. None of it conclusively support Pfizer's position.

Ultimately, Pfizer has produced no evidence which rebuts the admission by Dr. Hindmarch that he told Dr. Healy the details of the Hindmarch Study in late 1999 or early 2000 and the testimony by Dr. Healy that this conversation took place before he received the confidential documents in this case. For this reason, the Court cannot find that Dr. Healy violated the Court's protective order.

**IT IS THEREFORE ORDERED** that the Court adopts the Report Of Independent Experts (Doc. # 502) filed September 5, 2001.

**IT IS FURTHER ORDERED** that Defendant Pfizer's Inc's Refiled Motions To Exclude The Testimony Of Dr. David Healy And For Sanctions Against Dr. David Healy For Violations Of The Court's Protective Order (Doc. # 534) filed November 1, 2001 be and hereby are **SUS-**

**TAINED in part.** The Court will exclude Dr. Healy from testifying about (1) general causation (whether Zoloft causes suicide); (2) specific causation (whether Zoloft caused Matthew Miller's suicide); and (3) the adequacy of Pfizer's Zoloft warnings to physicians. The Court **OVERRULES** Pfizer's motion in part as to testimony regarding suicidology and the FDA's regulation of pharmaceuticals.

**IT IS FURTHER ORDERED** that Defendant Pfizer Inc's Motion In Limine No. 9 To Exclude The Use At Trial Of The Hindmarch Study, Dr. Healy's "Healthy Volunteer Study," And Dr. Healy's Statistical Analysis Of The Pfizer Meta–Analysis (Doc. # 304B) filed April 28, 2000 be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that Defendant Pfizer Inc.'s Opposition To Plaintiffs' Post Hearing Memorandum And Request For Independent Expert Verification; Request For Sanctions (Doc. # 547) filed November 29, 2001 be and hereby is **SUSTAINED** in its opposition to the request for independent expert verification of the Myers Report and **OVERRULED** as to its request for sanctions.

**IT IS FURTHER ORDERED** that Plaintiff's Post Hearing Memorandum, And Request For Independent Expert Verification (Doc. # 545) filed November 27, 2001 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that the Clerk of the Court send copies of this Memorandum and Order to the Court-appointed experts, in addition to counsel of record:

John M. Davis, M.D. University of Illinois at Chicago Department of Psychiatry UIC 912 South Wood Street Chicago, IL 60612 John Concato, M.D., M.S., M.P.H. Yale University School of Medicine 333

Cedar Street; SHM IE 61 New Haven, CT 06510.