**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 4 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARK MILLER, individually and as administrator of the estate of Matthew Miller, deceased; CHERYL MILLER, individually,

        Plaintiffs - Appellants,

        v.

PFIZER, INC., Roerig Division,

        Defendant - Appellee.

No. 02-3092

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 99-CV-2326-KHV)**

---

Arnold Anderson Vickery, Houston, Texas (James E. Fitzgerald, Cheyenne, Wyoming, and Earl Landers Vickery, Austin, Texas, with him on the briefs), for Plaintiffs - Appellants.

Malcolm E. Wheeler (James E. Hooper, Amy L. Padden and Craig R. May, with him on the brief), of Wheeler Trigg & Kennedy, P.C., Denver, Colorado, for Defendant - Appellee.

---

Before **EBEL** , **ANDERSON** , and **HARTZ** , Circuit Judges.

---

**HARTZ** , Circuit Judge.

Matthew Miller died at the age of thirteen, one week after beginning to take sertraline, an antidepressant drug marketed as "Zoloft." His parents sued Pfizer, the manufacturer of Zoloft, for wrongful death, claiming that Zoloft caused Matthew to commit suicide.

The Millers hired Dr. David Healy, who proposed to testify that Zoloft may cause suicide and had in fact caused Matthew to commit suicide. Applying standards outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny for determining whether expert testimony is admissible under Federal Rule of Evidence 702, the district court ruled that Dr. Healy could not testify. This left the Millers with no expert to provide evidence of causation. Accordingly, the court granted summary judgment to Pfizer.

The Millers appeal. Their principal claim is that the court did not give them a fair opportunity to make a proper record supporting Dr. Healy's conclusions. At the outset of discovery the Millers had requested the court to appoint independent experts to evaluate the opinions of the parties' retained experts. The district court did so only after completion of discovery. The court-appointed experts ultimately advised the court that Dr. Healy's analysis was

unscientific. The Millers now argue that the district court improperly deprived Dr. Healy of the opportunity to respond to concerns expressed by the independent experts. If the district court had indeed deprived Dr. Healy of that opportunity, the Millers might prevail on a claim of abuse of discretion. Our review of the record, however, establishes that the district court acted with patience and fairness. Most, if not all, of the concerns expressed by the independent experts had previously been expressed by Pfizer or the district court. The Millers have failed to identify any concern to which they lacked an adequate opportunity to respond. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.     BACKGROUND

Dr. Douglas Geenens diagnosed 13-year-old Matthew Miller with depression and prescribed Zoloft on July 21, 1997. Matthew hanged himself one week later. The Millers filed a wrongful death action against Pfizer in the United States District Court for the District of Kansas on July 27, 1999, basing federal jurisdiction on diversity of citizenship, *see* 28 U.S.C. § 1332. Their expert witness on causation has been Dr. David Healy, a neuropsychopharmacologist.

Zoloft belongs to a class of drugs called selective serotonin reuptake inhibitors (SSRIs). Dr. Healy asserts that SSRIs cause akathisia, a syndrome involving motor restlessness, which in turn causes some patients to commit

suicide. In forming his opinion Dr. Healy relied on various articles and studies involving Zoloft and other SSRIs. Of these studies, he placed the most emphasis on his own healthy-volunteer study, two "challenge-dechallenge-rechallenge" reports (in which subjects were given the drug, then not given it, and then given it again), and a study conducted by Dr. Ian Hindmarch (although he ultimately decided not to rely on the Hindmarch study). He also relied on depositions from this case; testimony, depositions, and exhibits from other cases; Pfizer documents; an application of what are known as Koch's postulates (which are employed to evaluate causality); and a meta-analysis he performed using Pfizer data.

Shortly after bringing suit, the Millers submitted a preliminary report prepared by Dr. Healy. Anticipating that Dr. Healy's views might be challenged by Pfizer, the Millers, in an effort to obtain validation of Dr. Healy's opinions from an outside source, filed a motion to appoint independent experts on October 21, 1999.

The court's first scheduling order, entered November 18, 1999, required the Millers to provide Pfizer with their Rule 26 expert disclosures no later than December 28, 1999. The scheduling order also set a deadline of February 11, 2000, for the Millers to provide Rule 26 disclosures pertaining to rebuttal experts. On January 10, 2000, Pfizer filed a "Motion to Limit Revision, Amendment or Supplementation of Expert Opinions Disclosed Pursuant to Rule 26(a)(2)." The

district court sustained this motion in part on January 28, 2000. It ruled that the Millers could "serve a supplemental <u>final</u> expert report on or before [March 7, 2000]," and final rebuttal expert disclosures by March 28, 2000. Dist. Ct. R., Doc. 115.

On March 27-28, 2000, Dr. Healy was deposed for ten hours. During the following two weeks the Millers provided Pfizer with supplemental responses to Pfizer's requests for admission. The responses contained an explanation of a statistical analysis performed by Dr. Healy. Objecting to the responses as untimely, Pfizer filed on April 17, 2000, an "Emergency Motion to Bar Plaintiffs' Expert, Dr. Healy, from Supplementing His Opinions and to Strike and Deem Admitted Plaintiffs' Second Supplemental Responses to First Requests for Admissions." Dist. Ct. R., Doc. # 195. The district court denied this motion on April 18, 2000, after observing that "[t]he newly disclosed information does not appear to substantially depart from information which has been previously disclosed." Dist. Ct. R., Doc. # 199 at 2. But it reserved its final ruling on the issue until it considered the parties' dispositive motions and stated that it "may well strike Dr. Healy's information because of the late hour at which it has been produced." *Id.* at 2-3.

Also on April 18, 2000, Pfizer filed a motion to exclude Dr. Healy's testimony under *Daubert*. Proceedings were delayed, however, when Pfizer's

attorney was seriously injured in an accident on June 2, 2000. The district court continued the trial date from July 18 to September 19, 2000. Then, on August 18, 2000, the district court issued an order staying all proceedings and directing the parties to show cause why independent expert witnesses should not be appointed. Ultimately, on April 24, 2001, the court entered an order appointing two independent experts, John Concato, M.D., M.S., M.P.H. and John M. Davis, M.D.

In its order appointing the experts, the district court identified the "fundamental question" on which it wanted advice: "whether Dr. Healy's methodology, and his application of it in this case, constitute valid, scientifically reliable reasoning in support of his opinions that Zoloft causes suicide (general causation) and that Zoloft caused Matthew Miller's suicide (specific causation)." Aplt. App. at 359. The order declared that "the parties [had been] afforded full opportunity to adduce evidence in support of their respective positions." *Id.* It then stated that the independent experts would be provided "(1) a copy of the parties' previously filed briefs pertaining to the motion to exclude Dr. Healy's testimony; (2) a copy of all exhibits cited or referred to in those briefs . . . ; (3) a copy of Pfizer's July 1999 Report to the Irish Medicines Board; (4) the letter of January 2000 from the Irish Medicines Board to Pfizer regarding the report; and (5) Dr. Healy's Declaration of August, 2000, which addresses the concerns which the Court articulated in its order to show cause." *Id.* at 360. The materials

provided to the independent experts included various expressions of Dr. Healy's opinions as they had evolved during the course of the litigation: reports dated September 22 and December 10, 1999; a Letter Report dated March 6, 2000; deposition testimony on March 27-28, 2000; responses filed in April 2000 to Pfizer's requests for admission; and declarations dated May 9 and August 31, 2000. The district court also encouraged the experts "to examine whatever medical or scientific literature is necessary to render their professional opinions." Aplt. App. at 361.

The independent experts submitted a report on September 5, 2001, that generally discredits Dr. Healy's theory and methodology. In response, the Millers filed a "Consolidated Statement of Facts" on October 23, 2001. *Id.* at 389. The court described it as a "45-page brief contain[ing] 145 separately numbered statements, 119 of which are presented for the first time in this document." Dist. Ct. Order (Nov. 16, 2001), Aplt. App. at 440. The district court granted Pfizer's motion to strike the statement on the grounds that it was not associated with any pending motion (or constituted an improper attempt by the Millers to supplement their summary-judgment briefing), did not comply with procedural rules, and was untimely.

On November 19-20, 2001, the district court held a hearing on the motion to exclude Dr. Healy's testimony as inadmissible under *Daubert.* The court

allowed Dr. Healy to engage in a dialogue with the independent experts but, apparently relying on Federal Rule of Civil Procedure 26, restricted the information on which his responses to their questions could be based to those materials that had previously been supplied to the independent experts. *See* Tr. of *Daubert* Hr'g, Aplt. App. at 592. The court explained:

> "[U]nder our federal rules which govern pretrial proceedings . . .
> there's a time set as part of the discovery process where each expert
> is required to produce a written report that states all of the opinions
> that . . . [the] expert will offer at the trial, and also the basis for the
> opinions. That has to be done by a certain time prior to trial. . . .
>
> . . . [T]o the extent that Dr. Healy had information and could have
> made calculations by that deadline, he was required to do that . . . ."

*Id.* In so limiting Dr. Healy, the court characterized his testimony as a "moving target" and declared that "the time for his expert opinions to be formulated and expressed and communicated to the other side is passed." *Id.* at 546. The Millers complain in particular that this ruling precluded Dr. Healy from presenting at the hearing some power-point slides that they contend would have addressed the concerns of the court-appointed experts.

Following the *Daubert* hearing the district court, largely adopting the views expressed by the independent experts, excluded Dr. Healy's testimony. The district court considered four factors identified by the Supreme Court in *Daubert* as relevant to the determination of whether a proffered expert's proposed testimony reflects scientific knowledge that will assist the trier of fact to resolve a

fact in issue: (1) whether the scientific theory or technique "can (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error" of the technique, and (4) whether the methodology has attained general acceptance in the scientific community. *Daubert*, 509 U.S. at 593-94. The district court concluded that with the exception of the first factor—whether the theory can and has been tested (which the court assumed to be satisfied)—the *Daubert* factors favored the exclusion of Dr. Healy's testimony. *Miller v. Pfizer*, 196 F. Supp. 2d 1062, 1072-85 (D. Kan. 2002). Because of the thoroughness of the district court's published opinion, our summary of its ruling is brief.

In analyzing the peer-review-and-publication factor, the court concluded that although Dr. Healy had published peer-reviewed articles expressing the theory that Zoloft causes suicide, his specific calculations of the risk of suicide had not been subjected to peer review. *Id.* at 1073 & n.32. With regard to the rate-of-error factor, the court noted several problems with Dr. Healy's healthy-volunteer study that were identified by the independent experts: (1) the study did not include a placebo control, (2) it involved extensive interaction between the participants and researchers, and (3) it utilized only a small sample size. *Id.* at 1074. The court accordingly concluded that the study did not include controls sufficient to demonstrate that Zoloft causes suicide in some patients. *Id.* at 1075.

Addressing the fourth *Daubert* factor, the court found that Dr. Healy had not utilized a generally accepted methodology in forming his opinions. Again referring to flaws in the design of the healthy-volunteer study, the court determined that reliance on the study did not constitute a generally accepted methodology for assessing any causal relationship between Zoloft and suicide. *Id.* at 1076. The court also decided that placing substantial emphasis on a few challenge-dechallenge-rechallenge studies and case reports is not a generally accepted methodology. *Id.* Because the court-appointed experts could not confirm the calculations Dr. Healy made through his meta-analysis of Pfizer's data, the court likewise ruled that his use of the meta-analysis was not a generally accepted methodology. *Id.* at 1078. Finally, the court decided that Dr. Healy's purported application of Koch's postulates was not a generally accepted methodology. The court concluded that Dr. Healy "misapplied, failed to satisfy, or failed to address six of the seven postulates . . . [; and] [t]o compound this problem, he has invented other factors and variously applied or misapplied them in ways which make it impossible to discern what his conclusions would be if they rested only on generally accepted methodology." *Id.* at 1084.

The district court decided to exclude Dr. Healy's testimony on general causation (whether Zoloft can cause suicide). It described his theory as being a "distinctly minority position" resting on only "a handful of case reports," and it

characterized the "flaws in Dr. Healy's methodology" as "glaring, overwhelming and unexplained." *Id.* at 1085.

The district court also excluded Dr. Healy's testimony on the issue of specific causation (whether Zoloft caused Matthew Miller to commit suicide). Dr. Healy had proposed to testify "that in his opinion, based on a review of notes by Matthew, reports by Matthew's father, and the deposition of Matthew's psychiatrist, Zoloft more likely than not caused Matthew to commit suicide and no other factor in his background or psychosocial situation could explain his suicide." *Id.* at 1085. Concerned, however, about "Dr. Healy's reliance on pre-selected evidence from interested parties, to the exclusion of reliable evidence that Matthew engaged in suicidal thoughts and behavior before he first used Zoloft," the court had "asked its independent experts whether selective reliance was consistent with generally accepted methodology on the issue." *Id.* at 1086. The independent experts informed the court that such selective reliance was not a generally accepted methodology. The court then concluded that "Dr. Healy's testimony on specific causation does not satisfy Rule 702 because it does not utilize sufficient facts and data and it is not the product of reliable principles and methods." *Id.* at 1087. In addition, the court noted that since it had sustained Pfizer's motion to exclude the testimony on general causation, "the issue of specific causation is for all practical purposes moot." *Id.*

Concluding that the Millers could not establish causation, the district court granted summary judgment to Pfizer.

## II.    DISCUSSION

On appeal the Millers contend that the district court (1) abused its discretion in restricting the information made available to the independent experts, (2) exceeded the bounds of a proper *Daubert* analysis when it excluded Dr. Healy's testimony, and (3) erred in granting summary judgment to Pfizer.

### A.    Information Provided to the Independent Experts

The Millers assert that they "attempted to complete the scientific record for the independent experts" by filing a consolidated statement of facts and by having Dr. Healy address the independent experts' concerns (in part by presenting at the *Daubert* hearing various power-point slides depicting graphs and calculations), but were denied that opportunity when the district court ruled that only certain information could be provided to the experts. Aplt. Br. at 28. According to the Millers, "'freezing' Dr. Healy's opinions for nearly two years and refusing to allow him to address concerns raised by <u>Daubert</u> motions filed, and independent experts appointed, after he had submitted his report (i.e., requiring their expert to answer questions in his report that had not yet been asked) constitutes an abuse of discretion." Aplt. Reply Br. at 1, & n.2. In their view, the district court erred in applying Federal Rule of Civil Procedure 26 so as to require Dr. Healy to

anticipate all issues that might be raised during the course of the proceedings. They conclude that "Pfizer did not win this case in the court below on the science. They won it by a clever application of a Rule 26 'gotcha.' They won it by persuading the district court that the rules of civil procedure somehow require an expert like Dr. Healy to be prophetic." Aplt. Br. at 43.

Under Federal Rule of Civil Procedure 26(a)(2), "a party shall disclose to other parties the identity of any person who may be used at trial to present . . . [expert testimony, and the disclosure must] be accompanied by a written report prepared and signed by the witness[,] . . . contain[ing] a complete statement of all opinions to be expressed and the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2). Supplemental disclosures are permitted, and indeed may be required. Fed. R. Civ. P. 26(e). Such supplements are to be disclosed by the time pretrial disclosures are due under Rule 26(a)(3). *See* Fed. R. Civ. P. 26(e). Failure to make proper disclosures may require exclusion of the expert as a witness. Fed. R. Civ. P. 37(c)(1). ("A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.")

We agree with the Millers that an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report. Accordingly, on

occasion it may be appropriate to permit the party using the expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning. A court's failure to permit such supplementation could even constitute an abuse of discretion in some circumstances. *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1228 (10th Cir. 2003) (district courts may abuse their discretion when deciding whether to admit expert testimony "by unreasonably limiting the evidence upon which to base the decision"). Where we depart from the Millers is that we find no abuse of discretion here.

To begin with, we disagree with the Millers' assertion that the district court improperly froze Dr. Healy's opinions for nearly two years. On the contrary, the Millers were given multiple opportunities to revise the opinions expressed in Dr. Healy's first Rule 26 report of August 13, 1999. The Millers provided Pfizer with a second Rule 26 statement dated December 10, 1999 (which was filed on April 18, 2000, as an exhibit to Pfizer's pretrial motions), and a letter by Dr. Healy dated March 6, 2000 (filed April 28, 2000, as an exhibit to Pfizer's motion in limine No. 9). On March 27-28, 2000, Dr. Healy was deposed for ten hours. And in April 2000 the Millers presented a supplemental response, and then a second supplemental response, to Pfizer's requests for admission. Both responses contained opinions of Dr. Healy.

Of particular significance are the submissions that respond to critiques of Dr. Healy's opinions. In April 2000 Pfizer filed a motion to exclude Dr. Healy's testimony. The motion alleged numerous gaps in Dr. Healy's testimony. For example, Pfizer asserted that Dr. Healy had "no data showing any higher rate of suicide in Zoloft (sertraline) patients than in unmedicated (placebo) patients," and it criticized Dr. Healy for not conducting a statistical analysis of available data. Aplt. App. at 254, 256. Pfizer also challenged Dr. Healy's application of Koch's postulates in some detail, with its basic argument being that he "grossly misapplied six of Koch's seven postulates and . . . failed to apply, or even mention, the seventh at all." *Id.* at 264. In addition, Pfizer contended that case reports "are not a reliable basis for an expert to opine on general causation." *Id.* at 273. The Millers had an opportunity to respond to Pfizer's motion; and their response (filed May 12, 2000) included a declaration by Dr. Healy dated May 9, 2000.

Then, in August 2000 the district court issued its order to show cause why it should not appoint independent experts. In the order the court expressed concern regarding Dr. Healy's application of Koch's postulates. It also raised questions about Dr. Healy's healthy-volunteer study, noting that the parties disagreed as to whether a placebo control is necessary and as to whether the study could form the basis for a calculation of statistically significant relative risk. The

Millers had an opportunity to respond to this order; and their supplemental response (submitted on September 11, 2000), included a declaration of Dr. Healy (dated August 31, 2000) addressing the concerns expressed in the court's order.

Up to that time the district court had not rejected any submissions in support of Dr. Healy's opinions. The independent experts were provided all these submissions, including the declaration specifically addressing concerns expressed in the court's show-cause order.

The Millers' grievance relates to restrictions on their responses to the report of the independent experts, issued on September 4, 2001. In general, the report expresses unfavorable opinions regarding Dr. Healy's analysis and theories. The independent experts shared the concern expressed in the court's show-cause order that parts of Dr. Healy's approach to evaluating causation were not consistent with Koch's postulates, citing for example: "a) applying some of the postulates solely to the association of sertraline and akathisia, or to the association of sertraline and improvement in symptoms of depression, rather than maintaining a focus on the association of sertraline and suicide, and b) discounting the possibility of sertraline reducing the incidence of suicide that would be observed without treatment." Aplt. App. at 367. They also determined that Dr. Healy's "methodology for determining medical causation has not been accepted in the relevant scientific community," and concluded that his heavy

reliance on case reports was not a generally accepted methodology for assessing strength of association *Id.* at 370. Moreover, they "[found] the premise that [randomized controlled trials] are undesirable for evaluating a potential sertraline-suicide association to be flawed." *Id.* at 371 (internal citation omitted). Similarly flawed, in their opinion, was Dr. Healy's comment that suicide is "vanishingly low" among 13-year-olds. *Id.* at 371-72 They also expressed concern about Dr. Healy's failure to rule out alternative explanations, and they stated that they were unable to replicate Dr. Healy's calculation of the relative risk of suicidal acts by persons on Zoloft compared to placebo. In addition, they concluded that Dr. Healy's healthy-volunteer study did not produce statistically significant results.

In October 2001, responding to the experts' report, the Millers attempted to file their Consolidated Statement of Facts. The district court refused to provide the independent experts with the statement.

The district court held the *Daubert* hearing on November 19-20, 2001. Dr. Healy was afforded an opportunity to respond to the concerns the court articulated in its show-cause order. He was, for example, permitted to explain his relative-risk calculation. At the hearing the parties' attorneys questioned Dr. Healy and the independent experts, and the independent experts in turn were permitted to question Dr. Healy. The district court did, however, preclude

Dr. Healy from discussing information that had not previously been provided to the independent experts. It also refused to let Dr. Healy give a power-point presentation depicting various graphs and calculations.

The Millers now argue that the district court abused its discretion in refusing to make their Consolidated Statement of Facts available to the court-appointed experts and in limiting the information that the independent experts could consider at the *Daubert* hearing. They assert that "they repeatedly implored the court to permit them and their expert witness to provide the independent expert with ALL of the scientific information currently available both from the public domain and from Pfizer internal documents, to answer any questions and concerns that the experts might have." Aplt. Br. at 6. They further say that they "urged that Dr. Healy be permitted to provide data and analysis from all of the information to which he had . . . been privy, including Pfizer's own healthy volunteer studies, which he reviewed in November 1999." *Id.* at 7. The Millers, however, have failed to establish an abuse of discretion.

Well before issuance of the independent experts' report, the Millers had been alerted to a number of concerns regarding Dr. Healy's opinions, and they had been afforded ample opportunity to submit Dr. Healy's responses to those concerns. The independent experts' embrace of many of these concerns did not require the court to grant Dr. Healy a further opportunity to persuade the court

(and the independent experts) by offering new data, analyses, and theories that could have been included in prior submissions. The orderly conduct of litigation demands that expert opinions reach closure. *Cf. Daubert*, 509 U.S. at 597 ("Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly.").

The Millers have failed to point to anything they proffered that was responsive only to matters in the independent experts' report that had not been raised previously by Pfizer or the district court. In particular, the Millers have provided no explanation how the assertedly crucial information contained in their Consolidated Statement of Facts was responsive to concerns raised for the first time by the independent experts. They likewise have not demonstrated why they could not have presented this information before the independent experts submitted their report. Nor do the Millers explain why it was unfair of the district court to refuse to permit Dr. Healy to make the power-point presentation that he attempted to give at the *Daubert* hearing. The power-point slides were based on data that the Millers acquired before Dr. Healy's expert report was due. The Millers offer no reasons why Dr. Healy could not have produced his analysis long before. The day of the hearing was a bit late to try to buttress the theory of their case by producing a new analysis by their retained expert of long-available data.

Our decision today is not based on a rigid application of the rules of civil procedure. *See* Fed. R. Civ. P. 1 ("These rules . . . shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). Far from improperly freezing Dr. Healy's opinions or holding him to his first Rule 26 statement, the district court allowed Dr. Healy to express revised opinions on numerous occasions. The district court exhibited patience and concern for fairness to both sides. It did not abuse its discretion.

## B.     Exclusion of Dr. Healy's Testimony

"[W]e review de novo the question of whether the district court performed its gatekeeper role and applied the proper legal standard in admitting an expert's testimony. We then review for abuse of discretion the trial court's actual application of the gatekeeper standard in deciding whether to admit or exclude an expert's testimony."

*Goebel v. Denver & Rio Grande W. R.R. Co.,* 346 F.3d 987, 989-90 (10th Cir. 2003) (internal citations omitted).

The Millers' focus is on the first type of review, whether the district court exceeded the scope of a proper *Daubert* inquiry. In their view, the district court followed *Daubert* "for a while," but then "**went beyond** . . . [*Daubert*] . . . to nit-pick bits and pieces of Dr. Healy's work and to question whether or not those portions followed proper scientific methodology." Aplt. Br. at 30. The court erred, they argue, "by straying far beyond the proper scope of the *Daubert . . .* matrix of analysis, and premising an exclusionary decision on concerns or

-20-

questions which affect the weight rather than the admissibility of Dr. Healy's testimony." *Id.* at 42. We disagree.

The district court carefully followed *Daubert* in determining whether Dr. Healy's opinions were founded on scientific principles. What the Millers call nit-picking, we would call being thorough. "The analysis outlined in *Daubert* is extensive, requiring the district court to carefully and meticulously review the proffered scientific evidence." *United States v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997) (internal quotation marks omitted). The court did not exceed the scope of the *Daubert* inquiry by, for example, considering Dr. Healy's credibility or weighing the evidence. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995); *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996). Rather, substantially relying on the opinions of the court-appointed experts, the court carefully and properly performed its gatekeeping function under *Daubert*.

Furthermore, to the extent that the Millers argue that the district court abused its discretion in applying the gatekeeper standard, we find no abuse of discretion. We hold that the district court did not err in excluding Dr. Healy's testimony.

### C. The Court's Decision to Grant Summary Judgment

Following the exclusion of Dr. Healy's testimony, the district court ruled that the Millers' claim must be dismissed as a matter of law because they had "no

-21-

scientific evidence of general causation." *Miller v. Pfizer*, 196 F. Supp. 2d at 1125. The Millers contended at oral argument before us, however, that they had enough evidence to avoid summary judgment even without Dr. Healy's testimony because Pfizer made an admission that, in and of itself, establishes general causation. We need not address this argument because it was not raised in their appellate briefs. *See Federal Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998). Nor have the Millers shown that they made this argument in district court. The district court's opinion states that "[t]o support their claim of general causation, plaintiffs have relied *exclusively* on the testimony of Dr. Healy." *Miller*, 196 F. Supp. 2d at 1125 (emphasis added). We need not consider an argument made for the first time on appeal. *See Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1385-86 (10th Cir. 1997).

III. **CONCLUSION**

We AFFIRM the summary judgment below. In addition, we grant Pfizer's Motion to Strike (filed December 16, 2002), and deny Pfizer's Motion to Take Judicial Notice (filed December 16, 2002), the Millers' Request for Judicial Notice (filed November 3, 2003), and the Millers' Second Request for Judicial Notice (filed December 19, 2003).